No. 45,009

JANE A. FINNEY, *Appellee,* v. JOHN C. FINNEY, *Appellant.*

(440 P. 2d 608)

Opinion filed May 11, 1968.

*Walter F. McGinnis,* of El Dorado, argued the cause, and *Allyn M. McGinnis,* of El Dorado, was with him on the brief for the appellant.

*Edward F. Arn,* of Wichita, argued the cause, and *Richard F. Mullins, Milo M. Unruh, H. R. Kuhn, Louis W. Cates, Roger K. Wilson,* and *Bernice Burket,* all of Wichita, were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is a child custody case in which the principal issue is the fitness of the child's natural father.

Gary, the child in question, was born September 22, 1960, one day after his mother, Jane A. Finney, filed a petition seeking divorce from his father, John C. Finney. This action was in the district court of Sedgwick county, Kansas, in which county the parents were then living. Almost immediately after birth Gary's mother turned him over to her sister and the sister's husband, Mr. and Mrs. George Irving of Augusta, Kansas. Gary has been living with the Irvings ever since and knows them, and them only, as his parents. The divorce was granted to the mother December 7, 1960. Property rights, child custody and support were settled in

accord with a stipulation of the parties. Custody of a thirteen year old son, Mike, who preferred to live on the farm with his father, was awarded to the father. The mother was awarded custody of a nine year old daughter, Wave, a six year old son, Dwight, and of Gary, then about ten weeks old. The father was ordered to pay $125.00 per month support money for the children whose custody was awarded to the mother and he was granted reasonable visitation rights.

In 1962 the second oldest boy, Dwight, having expressed a desire to live on the farm near Beloit with his father and older brother, the trial court, on October 12, 1962, pursuant to agreement of the parties, awarded Dwight's custody to the father and reduced the support money payments accordingly.

Each parent remarried. On December 9, 1963, the father filed a motion to change the custody of the daughter Wave, and also of Gary, to himself. On December 27, 1963, the mother filed a motion asking that the father be required to submit to a mental examination. Hearing was had on these motions. On January 6, 1964, the court denied the motion for mental examination but sustained the motion for change of custody as to Wave, to which the mother consented, it appearing Wave wanted to live with her father and had in fact been living with him for several months. The court terminated the support money payments to the mother on behalf of Gary and also terminated the father's right of visitation with Gary.

On February 28, 1964, the father's visitation rights with Gary were restored, the exact hours and days for each visit being designated over a period of several months, ultimately to be twice monthly.

Controversy again developed over visitation and on February 26, 1965, the father filed in the trial court an affidavit charging the Irvings with indirect civil contempt of court for refusing to allow him to visit Gary. As a result, a hearing was had on March 12, 1965, at which counsel for both parties stated their positions. The court found Mr. and Mrs. Irving not guilty of contempt and again terminated the father's right of visitation with Gary.

On March 26, 1966, Mr. and Mrs. Irving filed in the probate court of Butler county their petition to adopt Gary, alleging the mother had consented thereto and the father had abandoned Gary for more than two years. The father took steps to contest this adoption but the matter has not been heard and no ruling of any kind has been made therein.

On July 21, 1966, the father again filed a motion in the original divorce action asking that Gary's custody be changed from the mother to himself. This motion was heard and on August 12, 1966, the court denied the motion, found both parents unfit to have Gary's custody and awarded his custody to the Irvings. Both parents were relieved of support payments and denied visitation rights. Parental rights under K. S. A. 1967 Supp. 60-1610 (*a*) were not terminated. The father has appealed.

The father first complains of a procedural aspect. In its initial ruling from the bench at the August 12, 1966, hearing and in a subsequent letter to counsel the trial court made some statements and findings inconsistent with its final findings. These findings were clarified and corrected, and the inconsistency removed, in a subsequent letter and in the court's formal journal entry of judgment filed November 17, 1966, which was the only judgment entered of record in the case and must control despite any prior inconsistencies.

The court's ultimate findings were:

"1. The Plaintiff, Jane A. Finney, filed a Petition asking for a divorce from John C. Finney in Sedgwick County, Kansas, on September 21, 1960.

"2. Gary Finney was born September 22, 1960.

"3. Within approximately one week after the birth of Gary Finney, he was placed in the home of Mr. and Mrs. George Irving at Augusta, Kansas, by the Plaintiff. This is the only home the child has known since that date.

"4. The decree of Divorce and Journal Entry of Judgment, dated December 6, 1960, granted the custody of Gary Finney to the Plaintiff, mother. The Decree of Divorce grants the Defendant, father, the right to visit the minor children at reasonable times.

"5. The Defendant never attempted to exercise his right to visit Gary Finney as given him by the Decree of December 6, 1960, until December 9, 1963, when he filed a motion to change custody of Wave Finney and Gary Finney and terminate child support.

"6. Mrs. George (Peggy) Irving is a sister of the Plaintiff, Jane A. Finney.

"7. Mr. and Mrs. George Irving are the only parents Gary Finney has ever known. They are referred to by him as Dad and Mother. Mr. and Mrs. George Irving have had the sole care and custody of Gary Finney since one week after his birth and have had the full responsibility for his food, clothing, shelter, medical attention, and schooling. So far as Gary Finney knows, his name is Gary Irving. He is known in the community and is enrolled in school as Gary Irving.

"8. None of the facts contained in the above Findings 1 through 7 were ever concealed from the father, John C. Finney, nor has any attempt ever been made to conceal these facts from him.

"9. Gary Finney has never lived with his father, his mother, or his brothers and sisters. He does not know that John C. Finney is his father, nor does he know that Jane A. Finney is his mother. Gary Finney has never seen his father more than approximately 12 times and only for a few hours on such occasions.

Jane A. Finney sees Gary Finney frequently and she is known to him as his aunt.

"10. On February 26, 1964, this Court, after having been fully advised of the situation as it existed between John C. Finney and Gary Finney, entered an order of visitation. The primary purpose of this order was an attempt to acquaint a 4 year old boy with his father whom he had never known and to him was a total stranger.

"11. On March 12, 1965, after a hearing including medical testimony, the Court determined that for the health, welfare, and benefit of Gary Finney, the visitation rights of John C. Finney should terminate and were terminated. It is the opinion of this Court that the results of the Order of February 26, 1964, were detrimental to the health of Gary Finney.

"12. No attempt has been made by John C. Finney to secure custody or reestablish visitation rights between March 12, 1965, and July 21, 1966.

"13. John C. Finney has not, since the Court terminated child support payments for Gary Finney on January 6, 1964, attempted or offered to contribute anything toward the support of Gary Finney.

"14. Jane A. Finney has permitted Mr. and Mrs. George Irving to have the complete care and control of Gary Finney during his lifetime. She has made no attempt to secure the custody of the boy or raise or care for him in any manner.

"15. Mr. and Mrs. George Irving have provided Gary Finney with excellent care and attention during his lifetime and have made plans to continue to care for him as though they were his natural parents. Gary Finney knows only Mr. and Mrs. Irving as his parents and the natural relationship of father and mother and son exist between the Irvings and Gary Finney.

"16. Gary Finney, a boy 6 years of age, finds himself in his present situation through the actions and with the complete knowledge and consent of his natural parents. At the time of his birth, he was placed in the home of Mr. and Mrs. Irving by his mother with the knowledge of his father. The child was raised and completely cared for by the Irvings without interference, objection, or visitation by either parent until December 9, 1963. When the Court determined in March, 1965, that for the best interest of the child, the father's visitation should cease, the father made no attempts to renew custody, visitation rights, or interrupt the child's home life until July 21, 1966. At no time have the father or mother sent the child letters, presents, or voluntarily contributed to his support.

"17. After having considered the entire record on this case, heard the testimony offered, observed the Plaintiff, Defendant, Mr. and Mrs. George Irving, and other witnesses, and giving this matter much consideration, this Court finds that both Jane A. Finney and John C. Finney are unfit persons to have the care, custody, and control of Gary Finney. It is my opinion that neither of the natural parents are the suitable, proper, or correct persons, under all the circumstances of this case, to have the future care, and custody of Gary Finney. In my opinion, it would be an unconscionable exercise of judicial discretion to take this child from his present home, from those he considers his parents, and place him with persons who to him are strangers. For the future health, welfare, and general well-being of this child, he should be placed in the permanent custody of Mr. and Mrs. Irving."

The contest has thus resolved itself into one between the father

and the maternal aunt and her husband, the mother being willing that the latter have custody of Gary. The mother has explained her position by saying she turned Gary over to her sister because she had to work after the divorce; that she thought such an arrangement would be temporary but her remarriage failed; that Gary has known no other parents than the Irvings and had been upset to the point of requiring medical treatment when forced to be with others even for short periods; that doctors had advised her it would be injurious to his health to be taken from the Irvings; and that in spite of her love for Gary she felt it best for him to be permanently with the Irvings.

It has been firmly established in this jurisdiction that where the contest for child custody is between a parent and a third party, a parent who has not been found to be an unfit person to have custody in a proceeding where that question is in issue, is entitled to custody as against a third party or others who have no permanent or legal right to custody. (*Gardner v. Gardner*, 192 Kan. 529, 389 P. 2d 746; *Christlieb v. Christlieb*, 179 Kan. 408, 295 P. 2d 658). Conversely, where with good reason parents have been found unfit to have custody of a minor child, custody may be awarded to a third party. (*Decker v. Decker*, 171 Kan. 380, 233 P. 2d 527; *Jennings v. Jennings*, 174 Kan. 305, 255 P. 2d 618; *In re Stafford*, 193 Kan. 120, 392 P. 2d 140; see, also, K. S. A. 1967 Supp. 60-1610 [a].)

The father attacks the trial court's finding of unfitness on his part from several approaches. However, the issue determinative of all questions is whether that finding is sufficiently supported by substantial evidence. The father vigorously argues his unfitness was not shown.

Decisions of this character, which must be resolved in terms of fitness, are seldom easy for the trier of the fact or the reviewing court. Part of the difficulty lies in the fact the term "unfit" provides no precise measure by which every situation may be determined. We generally think of unfitness as some kind of moral delinquency. Most often moral delinquencies do constitute the unfitness found against parents and we tend to equate unfitness with fault. The term is not to be so narrowly limited. The case of *Decker v. Decker*, supra, was a child custody contest between a father and maternal grandparents. This court approved the trial court's award of custody to the grandparents despite a lack of showing of moral unfitness on the father's part. Other considerations were taken into account in determining fitness.

In *In re Vallimont*, 182 Kan. 334, 321 P. 2d 190, a child custody contest, this court said:

"There is no statutory definition of the word 'unfit.' It therefore must be given its ordinary significance, having due regard to the context. In general, the word means unsuitable, incompetent, or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency." (p. 340.)

Unsuitability for any reason, apart from moral defects, may render a parent unfit for custody. Each case must be considered and determined separately upon its own facts and the situation before the court.

Here the trial judge who granted the divorce and made the initial award of custody in 1960 was the same judge who heard all subsequent proceedings over a period of nearly six years. It would serve no useful purpose to detail all the evidence in the record, some of which was either controverted or subject to different interpretation. In addition to the evidentiary facts recited in the findings the trial judge heard evidence the father had undergone extensive hospitalization, including shock treatment, for mental illness (the Veterans Administration hospital record was read by the trial judge but not made part of the record); the judge also heard lay expressions of mental instability on the part of the father. There was testimony the father had seen Gary only twice up to January, 1964; that Gary was in excellent condition until further visitations were commenced but thereafter became emotionally upset by the visits and his doctors advised against such visitation; that the father is a stranger to Gary who knows him only as "that old man" and is afraid of him and has accused him of physical mistreatment; that the father had never given him any gifts at Christmas or birthdays, did not know Gary's birth date and had contributed nothing except as ordered by the court.

We have examined all the evidence, and, although in an initial hearing we might not all have reached the conclusion of the trial court, we are unable to say on appellate review there was insufficient evidence to sustain that court's judgment. As indicated, it is not a matter of assessing blame for one result of a broken home. The trial court had the parties before it numerous times and has had the advantage of seeing them, observing their demeanor, assessing their character, motives and the nature and quality of their affection, feeling and emotional stability, and of considering those factors

that can be more accurately evaluated from such observation than from the printed record now before us. The trial court seems to have acted throughout with utmost consideration for the best interests of the child. It cannot be denied close relation exists between the fitness or suitability of a parent to have custody and the welfare of the child whose custody is in issue. The two are entwined— almost inextricably. The capacity of the parent does not operate in a vacuum but upon the child where it is—its environment, understanding and affections—and necessarily entails effect upon the child.

We therefore hold the trial court's finding of unfitness was supported by substantial competent evidence (see *Decker v. Decker*, supra; *Jennings v. Jennings*, supra; *Neal v. Gleason*, 188 Kan. 692, 365 P. 2d 1111) and its judgment is affirmed.

APPROVED BY THE COURT.