No. 46,893

In the Interest of JOHN R. BACHELOR, a Child under eighteen (18) years of age. (State of Kansas, *Appellee*, v. Virgil Bachelor and Delores Lee Bachelor, *Appellants*.)

(508 P. 2d 862)

Opinion filed April 7, 1973.

*Owen J. Redmond, Jr.,* of Redmond, Redmond and Smith, of Wichita, argued the cause, and *Christopher J. Redmond,* of the same firm, was with him on the brief for the appellants.

*Keith Sanborn,* county attorney, argued the cause, and *Vern Miller,* attorney general, and *Mark F. Anderson,* deputy county attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This appeal derives from a two-step proceeding culminating in deprivation of parental rights under K. S. A. 1972 Supp. 38-824.

The appellants, Virgil Bachelor and Delores Lee Bachelor, are the natural parents of John R. Bachelor, who was born May 10, 1969. Shortly after John's birth, his mother Delores began experiencing epileptic seizures. In January, 1970, she suffered a severe seizure by reason of which she was hospitalized for three weeks at Larned State Hospital. On April 20, 1970, as a result of a proceeding in the Sedgwick county juvenile court instituted by Delores' brother,

Marion McVay, John was found to be a dependent and neglected child as defined by K. S. A. 1972 Supp. 38-802 (g) and he was placed in the temporary custody of Mr. McVay.

This ruling of dependency and neglect was appealed by Mr. and Mrs. Bachelor and on September 25, 1970, the ruling was affirmed after *de novo* hearing by the judge of division No. 4 of the district court of Sedgwick county. Sharon Marcy, dependent and neglect investigator for the juvenile court, was directed to make periodic reports concerning the child. No further appeal was taken from this ruling.

Thereafter, upon its own initiative the juvenile court instituted proceedings to terminate the Bachelors' parental rights respecting John. After full evidentiary hearing the Bachelors were found to be unfit persons to have John's custody and an order was made permanently depriving them of their parental rights and committing John to the custody of Sharon Marcy, who was named guardian for the purpose of consenting to John's adoption. It was ordered that John's temporary custody remain with Mr. and Mrs. McVay.

Upon the Bachelors' appeal to the district court wherein the matter was heard *de novo* by the judge of division No. 1, the rulings and orders of the juvenile court were affirmed on February 25, 1972. This appeal ensued.

The sole question on appeal is whether the finding of parental unfitness is supported by clear and convincing evidence. Upon our review we consider the evidence in its most favorable aspect to the party who prevailed in the trial court. We summarize the evidence.

The maternal uncle, Marion McVay, testified he was at the Bachelor home in January, 1970, immediately prior to Mrs. Bachelor's departure for the Larned hospital; at this time John was very much "upset", nervous and would go into hysterics when picked up; Delores told the witness she had thrown John to the floor and had called him a little bastard; his "rump was red raw" from not having been cleaned; his bowel movement was watery and he could not have a natural movement; his navel was black and his entire body was dirty; he had no crib but slept in a bassinet which was filthy, broken, flimsy and unsafe; a mouse had been in the bassinet; his clothing was filthy; the mother had used diapers torn in half and dirty diapers containing dry, hard material were lying around the house; Delores' mother lived in the same apartment building and

she seemed to dominate Delores; she had held Delores under her thumb since birth. This witness further testified Delores had been considered mentally retarded since she was five years of age; he would be afraid to turn John back to her; Delores had been hospitalized three times in psychiatric wards but would become angry at the doctors and leave which was the reason she had been ordered committed to the Larned hospital; Delores had been in a fist fight since her return from Larned and had used profanity; during the two year period McVay had custody of John, Delores visited the child three or four times but the father never did.

A half-sister to McVay and Delores (all had the same mother) testified that the relationship between Delores and her mother was a "very emotional one"; Delores was emotionally unstable and the witness could not recommend her to rear a child; the witness' mother had told her several times John's father had tried to kill him, had also stated she was afraid for the child and wouldn't give a "plugged nickel" for the child's life if returned to his father and that she would rather see him dead than in the care of his father; Delores and her mother argued and fought with much yelling and swearing; Delores once blacked her mother's eye; when the child was first taken by McVay he was nervous, cried a lot and would not take a nap.

The dependent and neglect investigator for the juvenile court testified that in her investigation she had interviewed the parents several times and also other witnesses; the father, who operated a small trash route, seldom appeared and Delores was always accompanied by her mother; Delores and her mother seemed totally dependent on each; the mother could not hear well and Delores had to interpret for her by yelling back; the mother said Delores had had no training, could not read, write or count money; the father never expressed himself during the visits at which he was present and seemed to lack initiative. The witness testified she was never able to see Delores alone and could not determine whether it had been Delores or her mother who actually looked after the child; in the opinion of the witness Delores was not stable enough to handle the child and parental rights should be severed; she had been unable to see any change in Delores. The witness had access to several psychiatric evaluations of Delores contained in the juvenile court file, to which the trial court also had access. The witness testified that the final conclusion of one doctor was that Delores was not capable of caring for a child and he did not see how she would in the future

be able to do so. Another psychiatric report indicated Delores was of considerably below normal intelligence and had personality problems, including "a good deal of emotional immaturity". She was found to be mentally retarded with very poor impulse control and marked behavioral disorder. She was quite entangled psychologically with he mother and the two were mutually dependent upon each other.

Both appellants testified. They attested to their love for their child and their desire to care for him and they offered testimony of neighbors favorable to their position.

After hearing the evidence the trial court made the following findings and conclusions:

"It must be found from the evidence in the case that the mother of the child exhibits extreme emotional instability and immaturity, and also mental and phycial defects and some symptoms of severe psychological disturbances, together with intellectual shortcomings and mental retardation. This much has been established by the specialists and other corroborating evidence in the case, from conduct and observation by the witnesses.

"It must be found that this father has shown an unusaul lack of desire or motivation or inability to function as a parent or at least to attempt to offset the wife's shortcomings in relation to the child.

"The Court also finds it is not likely that the parents together, since they have not in the past, can now or will likely in any reasonable future, be able to maintain a healthy, physical or mental environment for the child, to greatly improve the conditions, as they appear to have been in the present environment.

"It must be concluded that these parents are incompetent and unable to function reasonably as parents according to what we believe to be the minimum standards of parental fitness and conduct in this community. And that because of the poor prognosis of the parental situation, the best interest of the child is served far better by the continued severance of parental relations. This Court so finds.

"This refers to a permanment severance of parental relations as is contained in the Kansas Statutes under which the Juvenile Judge made his findings, and under which this Court now does likewise."

In its journal entry of judgment the court made the formal finding of unfitness requisite to deprivation of parental rights, which finding is now challenged by appellants.

K. S. A. 1972 Supp. 38-824 (c) provides for termination of parental rights of dependent and neglected children upon a finding of parental unfitness. Unfitness is not statutorily defined and such definition has been left to decisional law, with the result each case must be determined upon its own facts. In considering the meaning of the term "unfitness" in *In re Vallimont*, 182 Kan. 334, 321 P. 2d 190, this court stated:

"Parents who treat the child with cruelty or inhumanity, or keep the child in vicious or disreputable surroundings, are said to be unfit. Parents who abandon the child, or neglect or refuse, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for the child's well being are said to be unfit. Violence of temper or inability or indisposition to control unparental traits of character or conduct, might constitute unfiitness. So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from other moral defects." (p. 340.)

In *Finney v. Finney*, 201 Kan. 263, 440 P. 2d 608, we held:

"The word 'unfit' means, in general, unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Unsuitability for any reason, apart from moral defects, may render a parent unfit for custody." (Syl. ¶ 2.)

In *Vallimont* it was further stated:

"We think it entirely plain that misconduct on the part of parents which would empower a juvenile court to take jurisdiction of a child as 'dependent and neglected' [now K. S. A. 1972 Supp. 38-824(*b*)] is likewise such breach of parental duty as to make the parents unfit to be entrusted with the custody and rearing of their child in a custody award matter." (p. 339.)

K. S. A. 1972 Supp. 38-802(*g*) defines a dependent and neglected child as a child less than sixteen years of age:

"(1) Whose parent neglects or refuses, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for his well being;

"(2) who is abandoned or mistreated by his parent, stepparent, foster parent, guardian, or other lawful custodian;

"(3) whose occupation, environment or association is injurious to his welfare;

"(4) who is otherwise without proper care, custody or support. . . ."

In the case at bar four separate evidentiary hearings before three different judges have now been held respecting the child's welfare—each resulted in a verdict adverse to appellants. Procedural error has not been asserted and none appears. We need not labor the evidence adduced at the last hearing which supports the finding complained of here.

The deplorable condition of the child and its immediate surroundings while in its parents' custody clearly points either to parental misconduct or inherent incapacity to perform parental obligations, or both. These traits on behalf of each parent are indicated by all the evidence—gross neglect and mental and emotional incapacity

on the part of the monther and hostility and complete indifference to the child's welfare on behalf of the father. Change was shown to be unlikely. Clear and convincing evidence demonstrated parental unfitness on appellants' part and the judgment must be affirmed.

APPROVED BY THE COURT.