No. 47,279

IN THE INTEREST OF JIMM JOHNSON, ALLEN J. JOHNSON, KATHLEEN JOHNSON, THOMAS G. JOHNSON, JEAN JOHNSON and LEWIS M. JOHN-SON, Children under eighteen (18) years of age. (STATE OF KANSAS, *Appellee*, v. RUSSELL JOHNSON and ALICE JOHNSON, *Appellants.*)

(522 P. 2d 330)

Opinion filed May 11, 1974.

*David L. Hiebert,* of the Legal Aid Society of Wichita, Inc., argued the cause, and *Stephen J. Blaylock,* of Blaylock and Johnson, of Wichita, was with him on the brief for the appellants.

*Clifford L. Bertholf,* assistant district attorney, argued the cause, and *Vern Miller,* attorney general, and *Keith Sanborn,* district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is an appeal in a proceeding wherein parental rights were terminated pursuant to K. S. A. 38-824 and related provisions in our juvenile code. The issues are the admissibility of hearsay evidence in such a proceeding and sufficiency of the evidence to support a finding of parental unfitness.

Appellants Russell Johnson and Alice Johnson are the natural parents of Jimm Johnson, born February 27, 1956; Allen J. Johnson, born September 22, 1957; Kathleen Johnson, born October 16, 1958; Thomas G. Johnson, born December 4, 1959; Jean Johnson, born December 17, 1968; and Lewis M. Johnson, born September 11,

1970. The Johnsons first lived in Wichita where Mr. Johnson had some employment and the family received social welfare assistance.

The proceeding originated April 4, 1969, when petition was filed in the juvenile court of Sedgwick county to declare the first five of the above-named children dependent and neglected. The state sought the exercise of parental rights over the children. After hearing the juvenile court found that the children were dependent and neglected and severed parental rights. Mr. and Mrs. Johnson appealed this order to district court where, after *de novo* hearing, the children were again found to be dependent and neglected. However, the district court, division 4, found that permanent severance of parental rights was not justified because the neglect was not wilful. Custody was placed in the state department of social welfare and the proceeding was remanded to the juvenile court. All of the five children were placed in foster homes; however, Jean was eventually returned to her parents.

In April, 1971, Mr. Johnson departed from Wichita with the welfare check and did not return for a while. This action precipitated the filing of a petition alleging the dependency and neglect of Lewis M. Johnson, who had been born in the meantime, and further asking that parental rights in him be severed. On April 27, 1971, a temporary order was issued removing Jean and Lewis from the custody of Mrs. Johnson. Extensive hearings were held in juvenile court. Meanwhile Mrs. Johnson went to Douglas county, Nebraska, where Mr. Johnson had established himself and the two have lived there ever since. Next an amended petition was filed asking that parental rights in all the children be severed. Due notice was given and an evidentiary hearing was held. On November 15, 1972, the juvenile court found that all six of the children were dependent and neglected, that the Johnsons were unfit to have their custody and it severed parental rights as to all the children.

Mr. and Mrs. Johnson again appealed the matter to district court. There, after *de novo* hearing, the district court, division 9, made the same order as the juvenile court. The Johnsons now bring the matter here for review.

At the hearing before the trial court, in addition to live testimony, written reports of an evaluation of the Johnsons made by a psychiatrist in Nebraska and of an investigation made by a social welfare worker at Valley, Nebraska, were received in evidence over appellants' objection. The persons making the reports were not present.

The psychiatrist's report contained his opinions and the results of a number of psychological tests administered to the Johnsons. The juvenile court of Sedgwick county had after the initiation of the last termination proceeding requested the making of the evaluation and investigation in Nebraska where the Johnsons were living.

Appellants' objection, renewed here, is based on the hearsay aspect of the evidence received and the lack of opportunity for cross-examination. Appellee concedes the evidence was hearsay but contends that hearsay is admissible in juvenile court and further, the evidence in question was admissible as an exception to the hearsay rule. We will treat with the latter contention first. The exception relied on is that stated in K. S. A. 60-460 (*d*) (3), as follows:

". . . if the declarant is unavailable as a witness, a statement narrating, describing or explaining an event or condition which the judge finds was made by the declarant at a time when the matter had been recently perceived by him and while his recollection was clear, and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort. . . ."

K. S. A. 60-459 in pertinent part provides:

"(*g*) 'Unavailable as a witness' includes situations where the witness is: . . . (4) absent beyond the jurisdiction of the court to compel attendance by its process. . . .

"But a witness is not unavailable . . . if unavailability is claimed under clause (4) of the preceding paragraph and the judge finds that the deposition of the declarant could have been taken by the exercise of reasonable diligence and without undue hardship, and that the probable importance of the testimony is such as to justify the expense of taking such deposition."

Aside from the fact the reports here were not made *prior* to the commencement of the proceeding as required in 60-460 (*d*) (3), they were inadmissible because there was no indication the persons making them were unavailable as witnesses within the meaning of 60-459 (*g*) (4). The psychiatrist and the social worker were residents of Nebraska and not subject to subpoena. However, a juvenile court has authority to issue commissions to take depositions of witnesses without the state (K. S. A. 38-809 [*c*]) and there was no showing or finding made respecting the failure to take the witnesses' depositions. No attempt was ever made to qualify the reports as regular business entries and they simply were not admissible under any exception to the hearsay rule.

Appellee's argument that hearsay testimony is admissible in juvenile court proceedings is based primarily on language found in *In*

*re Waterman,* 212 Kan. 826, 512 P. 2d 466, to the effect our juvenile code is a complete, comprehensive enactment covering the field of certain classes of children and that it provides its own specific rules and procedures, including procedures for appeals. We were dealing there with a right purely statutory—the right to appeal from juvenile court to district court—in which the language used was particularly appropriate. Overlooked by appellee here are certain statutory provisions in the juvenile code which we think sufficiently supply an answer to the question posed in a matter of adjudication as serious as that of severance of parental rights.

K. S. A. 38-809 (*a*) empowers a juvenile court to compel the attendance of witnesses and to examine them under oath; subsection (*b*) authorizes it to issue subpoenas, citations and attachments; and, as indicated, (*c*) empowers it to issue commissions to take depositions, either within or without the state.

K. S. A. 38-820 provides that no order depriving a parent of parental rights shall be entered unless the parent is present in juvenile court or has been served with summons; further that the judge of the juvenile court shall assign an attorney to any parent who is unable to employ counsel, such counsel to be awarded a reasonable fee to be paid from the county general fund.

K. S. A. 38-830 makes parents whose actions have caused or contributed to the dependency and neglect of their children guilty of a misdemeanor and subject either to a fine not to exceed $1,000 or imprisonment in the county jail for a period not to exceed one year, or both.

And finally, K. S. A. 38-813 states:

"All witnesses shall be sworn on oath or affirmation, and the rules of the code of civil procedure relating to witnesses, including the right of cross-examination, shall apply to proceedings in the juvenile court. . . ."

Our civil procedural code contains no provision expressly prescribing the right of cross-examination other than that implicit in K. S. A. 60-460, which declares hearsay inadmissible where not specifically excepted. This statute in effect preserves the right of cross-examination in civil cases.

A district court may adjudicate custody of children in a private civil custody dispute; it may also, pursuant to K. S. A. 1973 Supp. 60-1610 (*a*), terminate parental rights in a divorce proceeding. In such situations there would be no question but that hearsay evidence not within one of the prescribed exceptions would be in ad-

missible under 60-460. It would seem anomalous to deny the use of hearsay evidence in such actions and allow it in a proceeding of the same character instituted in juvenile court. We think the legislature did not intend such a result.

Considering all the foregoing—the drastic nature of the measure sought to be applied, with possible attendant criminal aspects, the statutory provisos for securing live testimony under oath, the right to counsel and the explicit reference to our code of civil procedure —we hold that hearsay evidence is not admissible in the adjudicatory stage of a proceeding to terminate parental rights. We would not be heard to say that all proceedings in juvenile court are to be held to the same strict rules as those prescribed for hearings in district court; however, the requirements of the law are to be followed for a proper hearing to be had.

Our holding of error in the admission of hearsay evidence does not automatically compel reversal of the judgment appealed from. Appellee makes the further contention that the remainder of the evidence, without the hearsay, was of such nature as to justify the trial court's finding of parental unfitness.

Parental unfitness is not defined by our statutes. In *In re Vallimont*, 182 Kan. 334, 321 P. 2d 190, this court stated:

"Parents who treat the child with cruelty or inhumanity, or keep the child in vicious or disreputable surroundings, are said to be unfit. Parents who abandon the child, or neglect or refuse, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for the child's well being are said to be unfit. Violence of temper or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from other moral defects." (p. 340.)

In *Finney v. Finney*, 201 Kan. 263, 440 P. 2d 608, we had this to say:

"The word 'unfit' means, in general, unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Unsuitability for any reason, apart from moral defects, may render a parent unfit for custody." (Syl. ¶ 2.)

Appellee presented the testimony of five witnesses at the hearing before the trial court.

One witness, a child neglect investigator, had been familiar with the Johnson family since November, 1969; she interviewed Mrs. Johnson when Mr. Johnson left her in April, 1971. Mrs. Johnson,

who had the two younger children with her at the time, appeared to be quite lost; the two children were not receiving emotional support from Mrs. Johnson; about a month and a half later Mr. Johnson came into the investigator's office and was angry when she was unable to tell him where his wife was; he said he had seen Mrs. Johnson make love to other women.

The manager of the duplex in which the Johnsons lived in Wichita in 1971 testified respecting her observations: The house was always cluttered; the Johnsons put trash and raw garbage in the basement; they also stored garbage in the stove; cockroaches constituted "quite an ordeal"; the baby always remained in the baby bed and Jean was always tied to the potty chair; they were never seen playing; neither parent was ever seen talking to or playing with the children; once the baby had a black eye which Mrs. Johnson said resulted from falling out of the bed; the children were never fully clothed; complaints were made that the children were having colds because of the drafty conditions in the duplex; there were always dirty dishes in the kitchen along with cockroaches and silverfish; Mrs. Johnson said Mr. Johnson left her and took the rent check.

A witness who took Jean after a month's stay in the hospital testified that at first Jean was very nervous, hyperactive and cried a lot from fright; she seemed to be terrified of men; she could speak only one or two words; she didn't drink milk because she was no longer on a bottle and was unable to hold a glass; within about two weeks she could feed herself perfectly; she has since become a happy outgoing girl who loves to watch Sesame Street and recite the alphabet.

Another witness who had been caring for Kathleen Johnson since December 5, 1970, testified respecting her actions: Kathy, who was twelve years old when she came into the foster home, did not understand whether she had two shoes alike or not—she might put on a tennis shoe and a dress shoe at the same time or two other unmatched shoes; she could not set a table but learned after six months; she was very withdrawn; she was in the foster home three months before she had enough emotional response to laugh; evaluation later at the hospital revealed Kathy had some brain damage; she is now very particular about the care of her hair and how she dresses; she can count to 200, knows colors and her ABC's; she has certain chores around the house, helps take care of her own room, and can work puzzles; soon it is expected she will be taught to read.

Another witness testified about the actions of the three older boys in the home of himself and wife since November, 1970: These boys were aged fourteen, thirteen and eleven when placed in the foster home; when they first came they seemed starved for love and affection; they also hungered for food—at table it was first come, first served—if you didn't get there you didn't get any food at all; the youngest boy had a tendency to steal but this has been fairly well corrected; the oldest boy has been a problem because of lying and stealing and has been receiving psychiatric care; the middle boy could not tell time and do other things boys of his age can do; he is now in school and has received medication for his epileptic seizures; the boys seemed unfamiliar with routine personal hygiene.

The only witness for appellants was Mr. Johnson. He testified his bad home conditions in Wichita were the result of improper septic tanks. He denied that trash accumulated. He left home to locate a job and returned to find his children taken away. Two of them had epilepsy and a third had a medical problem. The Johnsons have had another child since moving to Nebraska. This child, six months old, is on a diet. He testified concerning two jobs he then held in Nebraska and the three-bedroom mobile home he was purchasing. He was of opinion he and his wife could adequately care for all of their children. His testimony recognized no health or emotional problems in the family other than just mentioned.

We think the evidence before the court, excluding the hearsay, virtually compelled a finding of parental unfitness, and hence the error in receiving the hearsay was harmless and the judgment must be affirmed. The trial court obviously had misgivings about receiving the hearsay because of the lack of opportunity for cross-examination. It commented specifically on the matter, the general import being that little weight or consideration would be given to the conclusions and opinions stated in the reports. The testimony of the five witnesses need not be labored—suffice it to say it revealed deplorable living conditions and atmosphere for the children, with sad results. The Johnsons, for whatever reason, and it did not appear to be financial, simply were unable properly to care for and rear their children. *Lennon v. State,* 193 Kan. 685, 396 P. 2d 290, involved parental fitness in a termination of parental rights proceeding. This court stated:

"We readily agree that parental rights are not to be considered lightly, and this court has always been diligent in their protection. [Citations] However,

when the welfare of a child so demands, the rights of its parents must yield to the paramount right of their offspring to receive proper parental care, guidance and control. Where such be the case, the state, in the rightful exercise of its power as *parens patriae,* has the duty to intervene on behalf of the child in furtherance of its legitimate interests." (p. 691.)

The judgment is affirmed.

APPROVED BY THE COURT.