(585 P 2d 1072)
No. 49,431

In the Interest of KATHLEEN PENN, a Minor

Opinion filed November 3, 1978.

*George W. Thomas* and *Steven D. Alexander,* of Kansas City, for the appellants.

*Muriel Andreopoulos,* Assistant District Attorney, *Curt T. Schneider,* Attorney General, and *Nick A. Tomasic,* District Attorney, for the appellee.

Before PARKS, P.J., SWINEHART and MEYER, JJ.

PARKS, J.: Dawson and Wilma Penn, the biological parents of ten-year-old Kathleen (Kathy) Penn, are appealing a district court order wherein they were adjudged unfit parents and their parental rights permanently severed. We affirm.

Since the Penns stipulated in May 1976 to the finding that Kathy was dependent and neglected, no question is being raised in that regard. Custody has been given to the Department of Social and Rehabilitation Services (SRS) and Kathy now lives in a licensed foster home.

Kathy has been experiencing emotional and developmental problems for a number of years. She had difficulty completing kindergarten and was enrolled in it for two years. Although school personnel referred the family for a mental health evaluation, the parents did not initially follow through. During the first grade Kathy again became the subject of the school staff's concern because her emotional problems had become more pronounced. Following their concerted efforts, Kathy was eventually evaluated at a mental health center and immediately admitted as an inpatient at the Rainbow Mental Health Center.

While living at home, Kathy was a very disturbed child. Some of the emotional problems she was experiencing were enuresis and encopresis (incontinence of the bladder and of the bowels, not due to an organic cause), extreme withdrawal, hysterical

outbursts and very poor speech. Her school attendance was poor and she had a great deficiency in the academic subjects as well as in intellectual and social skills. She also suffered from a total inability to relate to others and at the time she was admitted to the Rainbow unit she was functioning at the intellectual level of a three-year-old.

Since being removed from the home Kathy has made great strides, both while being cared for as an inpatient and while living in the foster home. Experts who testified during the hearing included two psychologists, two social workers and Kathy's special education teacher. They all agree that the change in Kathy has been phenomenal.

During the fourteen months that the severance question was under advisement, the Penns did make regular supervised visits. Kathy, however, unfortunately regressed during these visits which were marked by a high degree of anxiety in Kathy and a complete parent/child role reversal. The first indication that the Penns were responsible for Kathy's problems was perceived during a quarantine following an outbreak of chicken pox at the children's cottage at Rainbow. Though Kathy had been going home for weekend visits, during the quarantine visits were not possible. The result was a total changeover in Kathy's approach to those around her. Previously she had stood apart from the group with her fingers in her mouth, appearing terrified. She would shake or tremble when approached by any adult staff member. Other possible factors in the home, such as noxious gas leakage, were explored and discounted as being the cause of Kathy's problems. The inescapable conclusion is that the Penns were strong detrimental influences on Kathy's emotional health.

Efforts to help the Penns improve their parenting skills and alter their manner of relating to Kathy have been futile and the prognosis for improvement in this area is poor. One of the problems is that the Penns themselves do not have the emotional stability to meet Kathy's needs. They deny that she has any problems and even after therapy lack insight into how Kathy's behaviors developed and how they might deal with them in the future. Although the professionals who have successfully treated Kathy testified during the hearing that it is mandatory for Kathy to have a consistent, structured environment if she is to attain normal growth and development, the Penns resist changing their

method of child rearing which is too unstructured, nondirective and passive for a child of Kathy's nervous, insecure disposition. Even when compelled by external agencies the Penns find it extremely difficult, if not impossible, to make demands upon Kathy. They persist in believing that all they need to do is to take Kathy back home and love her and everything will be all right.

It is difficult to envision a home situation which would be more detrimental to a child with Kathy's particular needs. In so saying, we do not imply that we will disturb a normal family relation merely because others may be better able to give the child greater comforts, wider education or the promise of a larger inheritance. See *In re Vallimont,* 182 Kan. 334, Syl. ¶ 3, 321 P.2d 190 (1958). Nor do we discount the value of love and affection, which the Penns seem willing to give Kathy within the limits of their capacity. However, love alone is not sufficient. *Lennon v. State,* 193 Kan. 685, 690-691, 396 P.2d 290 (1964). The psychological and emotional health of a child is no less a concern of this court than is the physical care.

In reviewing the sufficiency of evidence to support a finding of unfitness, the evidence is viewed from the aspect most favorable to the findings made by the trial court. *Cf., In re Bachelor,* 211 Kan. 879, 880, 508 P.2d 862 (1973); *In re Hambelton,* 2 Kan. App. 2d 68, 574 P.2d 982 (1978). A parent will not be permanently deprived of parental rights with respect to a dependent and neglected child unless there is clear and convincing evidence. *In re Nelson,* 216 Kan. 271, 276, 531 P.2d 48 (1975).

The word "unfit" means in general, unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. *In re Armentrout,* 207 Kan. 366, Syl. ¶ 3, 485 P.2d 183 (1971). So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from any other defects. *In re Vallimont,* 182 Kan. at 340.

Inherent mental and emotional incapacity to perform parental obligations can constitute such breach of parental duty as to make the parents unfit to be entrusted with custody of their child. See K.S.A. 1977 Supp. 38-824(c); *In re Johnson,* 214 Kan. 780, 522 P.2d 330 (1974); *In re Bachelor,* 211 Kan. at 883.

The testimony of witnesses need not be labored. Suffice it to say

that the Penns have a regrettable incapacity to meet the needs of this particular child, with sad results. To return Kathy to a situation so destructive to her emotional well-being would negate her courageous growth toward healthy development and might very well cause a regression from which she would not again emerge. Nor can any benefit be seen in retaining Kathy forever in a dependent-neglected-child status, living in the limbo of foster care with parental rights intact. We conclude that there is clear and convincing evidence to support the trial court's finding of unfitness and its order of parental severance.

Judgment is affirmed.