No. 50,012

In the Interest of DANIEL, GLADYS AND PAUL KERNS, Juveniles Under Eighteen Years of Age.

(594 P.2d 187)

Opinion filed May 5, 1979.

*Frank Kerns,* natural father of Daniel, Gladys and Paul Kerns, argued the cause *pro se,* and *Terry E. Beck,* of Topeka, was on the brief for the appellants.

*Kenneth M. Carpenter,* of Carpenter, Myers, Newsom & Carpenter, Chartered, of Topeka, argued the cause and was on the brief as guardian ad litem.

*Joan M. Hamilton,* assistant district attorney, argued the cause, and *Curt T. Schneider,* attorney general, and *Gene M. Olander,* district attorney, were with her on the brief for the appellee.

The opinion of the court was delivered by

MCFARLAND, J.: This is an appeal by the parents, Frank and Anna Kerns, from a judgment depriving them of their parental rights as to three minor children, pursuant to K.S.A. 38-824 (this statute was amended in 1976 and 1978, but the amendments make no changes relevant herein).

The facts are lengthy and complex as is borne out by the trial court's summary of the evidence which extends over some twenty-five single-spaced pages. Nothing would be gained from including a detailed recitation of the trial court's evidentiary statement. Rather, the facts will be highly summarized in general terms which explain the situation. Frank Kerns, the father, was born in 1931 and had a long history of mental illness. Due to the nature of his personality and illness he vigorously resists efforts to assist himself or his family. Anna Kerns, the mother, who was born in 1945, has been repeatedly characterized by professionals as immature, childlike, disorganizing under stress, and totally dependent upon her husband. The three children involved in this

action are: Daniel, born October 4, 1969; Gladys, born February 18, 1971; and Paul, born September 5, 1972.

The family first came to the attention of the authorities in 1973. From that time until February 23, 1978, when the district court entered its severance order (on appeal from the severance order of the Shawnee County Juvenile Court, entered January 30, 1976), a veritable army of professionals in a wide array of fields worked with, attempted to assist, or evaluated the family or some of its component parts. Without attempting to name all the individuals involved, the following are some of the agencies and departments within agencies attempting to deal with the problems: Topeka-Shawnee County Health Department; Highland Park Well Child Clinic; Family Service and Guidance Center; Shawnee County Welfare Department; Shawnee County Court Services; Child Development Center of Topeka State Hospital; Topeka Public Schools Head Start Program; State Department of Social and Rehabilitation Services; Capper Foundation for Crippled Children; Protective Services Department of S.R.S.; and the Menninger Foundation.

Innumerable reports were on file with the juvenile court from which a clear picture emerges. All three children had severe language development retardation, absence of toilet training, emotional problems, and other evidence of extreme environmental deprivation. When in their parents' home they were dirty and frequently bruised (apparently by accident as there is no claim of actual physical abuse). The severity of each child's psychiatric and developmental condition was in direct correlation to the age of the child. That is, the oldest child, Daniel, has such severe problems he cannot function in a foster home and is institutionalized. The two younger children are functioning in a foster home, with the middle child (Gladys) having more problems than the youngest (Paul). In 1973, 1974, and 1975 the children were in and out of the parents' care. When removed from the home, they improved—when returned to the home for even such a short period of time as a weekend, they retrogressed. Throughout this period the goal was to rehabilitate and preserve the family unit. One by one, the agencies closed their doors to the family, due primarily to Frank's refusal to cooperate and, at times, his abusive conduct toward the staff. Anna, predictably, went meekly along with her husband's decisions in this regard.

As previously stated, on January 30, 1976, the juvenile court severed parental rights. An earlier dependency and neglect action (not involving severance) had ended in the district court when the parents stipulated the children were dependent and neglected. This severance action was appealed to the district court and the trial was held July 6-7, 1976. At the conclusion of the evidence, the court ordered home studies to be made. The reports came back to the court confirming the childrens' problems and that they were better off in their present environments (out of the home). Finally, on February 23, 1978 (18 months after trial), the district court entered its order of severance, stating:

"43. The Court, therefore, finds that the above-named minor children, Daniel, Gladys and Paul Kerns are dependent and neglected and that Frank and Anna Kerns, the natural parents of such children, are unfit for the following reasons:

"a. Such natural parents failed and neglected to maintain proper standards of personal hygiene and cleanliness for such minor children;

"b. Such natural parents failed and neglected to maintain proper standards of cleanliness for their home in Topeka, Kansas, while such minor children were in their custody;

"c. Such natural parents failed and neglected to properly care for the medical needs of such minor children;

"d. Such natural parents failed and neglected to properly care for the nutritional needs of such minor children;

"e. Such natural parents failed and neglected to maintain effective discipline and parental control necessary for the well-being of such minor children;

"f. Such natural parents failed and neglected to provide a stable home environment with the limits, routines and consistencies necessary for the proper growth and development of such minor children;

"g. Such natural parents failed and neglected to accept the responsibility of maintaining treatment and educational schedules necessary for the well-being of such minor children;

"h. Such natural parents failed and neglected to cooperate with treatment programs established to advance the welfare and best interests of such minor children;

"i. Such natural parents failed and neglected to provide a physically and emotionally safe home environment conducive to the healthful growth and development of such minor children;

"j. Daniel, Gladys and Paul Kerns have been damaged and are suffering from retarded growth in speech, language, cognition and emotional development as a result of serious early deprivation, instability, lack of opportunity to develop learning skills and a chaotic home environment while in the custody of their natural parents;

"k. Gladys and Paul Kerns have benefited from their placements in a foster home;

"l. Daniel Kerns requires institutional placement in a structured living situation with educational and treatment facilities such as the Gillis Home;

"m. There is a substantial probability of future deprivation if such minor children were returned to the custody of their natural parents."

From this order the parents appeal.

The first issue on appeal is whether the trial court erred in admitting into evidence certain material from the juvenile court file. As would be assumed from the factual situation, a large number of letters and reports from the various agencies involved were in the court file. In most instances the children were wards of the court when the agencies were in contact with them and their parents, and such agencies were working with the family under court auspices. Periodic reports were naturally sent to the court. The various agencies had copies of their own prior reports, and often those of other agencies, and repeatedly refer to such other reports. Due to the length of time involved, personnel changes occurred within agencies and new people took over the case. The reports pyramid on each other. By the time of trial before the district court, various witnesses as to the present situation had no personal knowledge of previous contacts with the family and relied on the earlier reports for background information. At the beginning of the trial the guardian ad litem for the children requested the court to take judicial notice of this material to avoid having to call each person involved therein as a witness. The parents' retained counsel, on direct questioning by the court, stated he had no objection to that procedure. The reports, letters, etc., designated the "social file," were admitted as Exhibit 1.

The parents now object to the court's consideration of Exhibit 1 on the ground that much of it was hearsay and that it was an improper subject for judicial notice. The long-standing Kansas rule is that failure to lodge a contemporaneous objection to the admission of evidence prevents a party from complaining about the admission of that evidence. *State v. Phipps,* 224 Kan. 158, Syl. ¶ 1, 578 P.2d 709 (1978). No error is shown in the admission of this evidence.

The second issue on appeal is whether the trial court erred in requiring the father, Frank, to submit to a psychiatric evaluation. The evaluation was ordered, on motion of the guardian ad litem, while the case was awaiting trial on the appeal to the district court. The evaluation was presumably ordered pursuant to K.S.A. 60-235(a), which provides:

"*Order for examination.* When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce for examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made. The moving party shall advance the expenses which will necessarily be incurred by the party to be examined."

The father's mental condition was a major issue throughout the proceedings. The parents' first witness at the trial was Dr. George Dyck, a psychiatrist retained by the parents, who testified as to their mental condition. Dr. James Horne, the Shawnee County Court Services psychiatrist, who made the court-ordered evaluation, testified at the trial as the State's first witness. The bulk of the State's evidence, both before the juvenile court and the district court, was to the effect that the father's psychiatric makeup was the principal causative factor for the children's problems.

The parents argue on appeal that K.S.A. 60-235(*a*) was not applicable to the proceedings. They base this contention on the fact the proceedings herein were under Chapter 38 (Juvenile Code) and argue that an order pursuant to K.S.A. 60-235(*a*) was improper. This case arose prior to court unification and the statute in effect at the time relative to the scope of Chapter 60 (Code of Civil Procedure) was set forth in K.S.A. 60-201 (Corrick) as follows:

"This article governs the procedure in the district courts of Kansas and original proceedings in the supreme court in all suits of a civil nature whether cognizable as cases at law or in equity with the exceptions stated in section 60-265."

K.S.A. 38-813, in the form in effect at the time, provided:

"All witnesses shall be sworn on oath or affirmation, and the rules of the code of civil procedure relating to witnesses, including the right of cross-examination, shall apply to proceedings in the juvenile court. Only witnesses who have been subpoenaed shall be allowed witness fees and mileage. No witness shall be entitled to be paid such fee or mileage before his actual appearance in court."

This court has used K.S.A. 38-813 as a basis to apply the hearsay rules (K.S.A. 60-460) to juvenile court proceedings. *In re Harris,* 218 Kan. 625, 544 P.2d 1403 (1976); *In re Johnson,* 214 Kan. 780, 522 P.2d 330 (1974).

The Juvenile Code is to be liberally construed for the protection of dependent and neglected children. This concept is well stated in *Lennon v. State,* 193 Kan. 685, 689-90, 396 P.2d 290 (1964), as follows:

"[W]e must ever bear in mind the purpose which underlies the Juvenile Code and the beneficent objectives which the code seeks to attain. These objectives are well expressed in 38-801, *supra,* which provides:

" 'This act shall be liberally construed, to the end that each child coming within its provisions shall receive such care, custody, guidance, control and discipline, preferably in his own home, as will best serve the child's welfare and the best interests of the state. In no case shall any order, judgment or decree of the juvenile court, in any proceedings under the provisions of this act, be deemed or held to import a criminal act on the part of any child; but all proceedings, orders, judgments and decrees shall be deemed to have been taken and done in the exercise of the parental power of the state. This section shall not apply to proceedings under section 30 [38-830] of this act.'

"The statute is but a legislative expression of the concern which the people of this state have always had for the welfare of children. This court early gave voice to the public feeling in this regard. Speaking for the court in the case of *In re Bullen,* 28 Kan. 781, Justice Brewer posed the paramount question:

" ' . . . What will be best for the welfare of the child? . . .' (p. 786.)

"Like a vivid, vital strand, this concept of what is best for the child runs through the tapestry woven from our many decisions dealing with child custody, care and placement."

We do not hesitate to hold that when the mental condition of the parent is a basic issue of dependent and neglected child proceedings, the district court may proceed under K.S.A. 60-235. Under the circumstances herein the district court did not err in ordering the psychiatric evaluation of the father.

The next issue on appeal is whether the trial court erred in allowing opinion testimony over objection from a witness allegedly not qualified as an expert.

The witness whose testimony is complained of is Charles Krall, psychology intern at the Topeka State Hospital, who had a master's degree in Clinical Psychology and was working toward his doctoral degree. He testified, without objection, as to various psychological tests he had administered to the child, Daniel. The witness's written report of the tests, results and conclusions had previously been admitted into evidence without objection. The witness had already answered many opinion questions, without objection, as to the causative factors for Daniel's problems, his special needs, etc. Objection was made only to the following question:

"Q. Would you give us an example of what a set of parents would do in order to reinforce appropriate behavior or appropriate development at this stage?"

The precise objection was as follows:

"MR. SWOYER: I object to that as purely speculative. I don't think the witness can answer this question."

The objection was not to the witness's qualifications, but to what counsel felt was the speculative nature of the question. While not reciting all questions asked and answers adduced prior to the objection, we have carefully reviewed the record and no error is shown. The argument would be better addressed to the weight to be afforded the answer rather than its admissibility.

The next issue on appeal is whether there was substantial competent evidence to support the findings of the trial court and its order of severance of parental rights.

K.S.A. 38-802(g), in effect at the time, provided:

"(g) 'Dependent and neglected child' means a child less than eighteen (18) years of age:

"(1) Whose parent neglects or refuses, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for his well being;

"(2) who is abandoned or mistreated by his parent, stepparent, foster parent, guardian, or other lawful custodian;

"(3) whose occupation, environment or association is injurious to his welfare;

"(4) who is otherwise without proper care, custody or support of; or

"(5) who, by reason of the neglect of his parent to provide him with proper or necessary support, education or care, is in the custody of a children's aid society or is being supported by the county or state; except that a child shall not be classed as a 'dependent and neglected child' under this subsection solely because of the fact that he or his parent, or both, receive assistance under the social welfare acts or otherwise receive support from public funds."

K.S.A. 38-824(c), in effect at the time, provides:

"(c) When the parents, or parent in the case there is one parent only, are (or is) found and adjudged to be unfit persons (or an unfit person) to have the custody of such dependent and neglected child, K.S.A. 38-820 and other applicable provisions of this act having been fully complied with, the juvenile court may make an order permanently depriving such parents, or parent, of their (his or her) parental rights and commit the child:

"(1) To the care of some reputable citizen of good moral character;

"(2) to the care of some suitable public or private institution used as a home or place of detention or correction;

"(3) to the care of some association willing to receive it, embracing in its objects the purpose of caring for or obtaining homes for dependent and neglected children;

"(4) to the secretary of social and rehabilitation services."

As to what constitutes being "unfit," this court stated in *In re Johnson,* 214 Kan. at 784:

"Parental unfitness is not defined by our statutes. In *In re Vallimont,* 182 Kan. 334, 321 P.2d 190, this court stated:

" 'Parents who treat the child with cruelty or inhumanity, or keep the child in vicious or disreputable surroundings, are said to be unfit. Parents who abandon the child, or neglect or refuse, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for the child's well being are said to be unfit. Violence of temper or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from other moral defects.' (p. 340.)

"In *Finney v. Finney,* 201 Kan. 263, 440 P.2d 608, we had this to say:

" 'The word "unfit" means, in general, unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Unsuitability for any reason, apart from moral defects, may render a parent unfit for custody.' (Syl. ¶ 2.)"

The Kansas Court of Appeals held in *In re Penn,* 2 Kan. App. 2d 623, 625, 585 P.2d 1072 (1978):

"The word 'unfit' means in general, unsuitable, incompetent or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. *In re Armentrout,* 207 Kan. 366, Syl. ¶ 3, 485 P.2d 183 (1971). So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from any other defects. *In re Vallimont,* 182 Kan. at 340.

"Inherent mental and emotional incapacity to perform parental obligations can constitute such breach of parental duty as to make the parents unfit to be entrusted with custody of their child. See K.S.A. 1977 Supp. 38-824(*c*); *In re Johnson,* 214 Kan. 780, 522 P.2d 330 (1974); *In re Bachelor,* 211 Kan. [879, 883, 508 P.2d 862 (1973)]."

In reviewing the sufficiency of evidence to support a finding of unfitness, the evidence is viewed from the aspect most favorable to the findings made by the trial court. *In re Penn,* 2 Kan. App. 2d at 625. A parent will not be permanently deprived of parental rights with respect to a dependent and neglected child unless there is clear and convincing evidence. *In re Nelson,* 216 Kan. 271, 276, 531 P.2d 48 (1975).

The court's findings of fact (paragraph 43 a through m) are contained elsewhere in this opinion and will not be repeated here. One additional statement from the trial court's journal entry should be included herein as follows:

"42. There is massive, as well as clear and convincing evidence, particularly in the form of reports from social agencies (see Exhibit No. 1), of a consistent pattern of severe and continuous neglect together with indifference in a number of areas important to the well-being of the minor children in question. It was not a mere coincidence that such delinquent conduct on the part of the natural parents was observed by so many different persons and agencies with training or experience in fields related to child care."

We have carefully reviewed the voluminous record and are satisfied the trial court's findings of fact and conclusions that Frank and Anna Kerns be permanently deprived of their parental rights to the minor children, Daniel, Gladys and Paul Kerns, are supported by clear and convincing evidence.

Finally, the parents argue that even if the claimed errors are held to be individually insufficient to require reversal of the judgment of the trial court, their cumulative effect requires reversal. We have found no trial errors and accordingly this point is without merit.

The judgment is affirmed.