(575 P.2d 894)
No. 49,230

In The Matter of the Adoption of Baby Girl Lathrop, a minor. John G. Hernandez and Susan Hernandez, *Appellants and Cross-Appellees,* v. Leon Scott, Jr., *Appellee and Cross-Appellant.*

Opinion filed February 24, 1978.

*Hosea Ellis Sowell,* of Kansas City, for the appellants and cross-appellees.

*James Forrest McMahon,* of Kansas City, for the appellee and cross-appellant.

Before Swinehart, P.J., Foth and Abbott, JJ.

Swinehart, J.: This is an appeal by prospective adoptive parents from a district court order denying their petition to adopt. The issues on appeal, both of first impression in Kansas, are whether the natural father of an illegitimate child has a paramount right over non-parents to custody of that child, and whether that portion of the Kansas adoption statute which requires the consent of the unwed mother but not the unwed father

for adoption is unconstitutional. The trial court held that the natural father of an illegitimate child has a paramount right to custody as against non-parents where both the adopting parents and the natural father are found to be fit, and denied the adoption petition. The prospective adoptive parents appeal the trial court's ruling regarding this issue. The court did not address the constitutional issue; the natural father brings a cross-appeal challenging the court's refusal to resolve this question.

It is undisputed that appellee Leon Scott, Jr., and the natural mother are the biological parents of Baby Girl Lathrop, a minor. Unmarried, this couple lived together for several months in the state of Louisiana. During this period of time, the subject of this action was conceived. Several months prior to the birth of the child, the mother returned to the state of Kansas, terminating the previous living arrangements with Leon Scott, Jr. Sometime between the date of her return to Kansas and the birth of the child, Leon Scott, Jr., moved to Colorado. Baby Girl Lathrop was born in Kansas City, Wyandotte County, Kansas, on August 16, 1976. On August 18, 1976, the natural mother executed before a notary public a document entitled "Consent of Unmarried Mother to Adoption of Minor Child." Included in that document was a waiver of further notice of the final hearing and entry of decree of adoption. She further stated therein that Leon Scott, Jr., was the natural father of Baby Girl Lathrop; that she had not received support from him; and that his whereabouts were unknown to her. Based on the mother's consent, the appellants filed a petition for adoption on August 18, 1976. By probate court order, they received custody of the subject child pending a hearing on their petition of adoption, and they have had custody of the child continuously from that date to the present time. Leon Scott, Jr., was not originally notified of the filing of the petition for adoption, nor was his consent to the adoption obtained. The record does not reveal how he learned of the birth of the child or the pending adoption. Suffice it to say, the appellee did learn of the facts and he appeared at the proceeding, filed his objection to the adoption and requested custody of the child. The appellee admits that he is the natural father of the child, and he further states that he paid some support to the child's mother, as well as medical expenses made known to him.

A hearing on the petition for adoption was conducted on

October 18, 1976, in probate court. Oral testimony and briefs were presented. The probate court denied the adoption and awarded custody to Leon Scott, Jr. Petitioners appealed to the district court. The case was tried to the district court *de novo* on the briefs and the stipulated facts and admissions filed in the probate court. The district court found that the appellee was the natural father of the minor child; that the woman who had executed the consent was the natural mother and had legally executed the consent to adoption; that the appellee had standing to object to the proposed adoption; that the appellee had timely appeared, objected and withheld his consent to the adoption and had requested custody of said child; that appellants and appellee were fit persons to have custody of said child; that the parental preference rule was applicable to these facts and that the appellee's rights as a natural father were paramount to those of petitioners; that appellee's rights as a parent to said child would not be terminated; and that the adoption would be denied. The court further ordered that the State of Kansas, department of vital statistics, issue a corrected birth certificate showing that Leon Scott, Jr., was the father of said child and changing the name of Baby Girl Lathrop to the surname of the natural father and first and middle names of his choice. The appellants subsequently obtained a stay of custody pending appeal of the decision.

The thrust of the appellants' argument on appeal appears to be that the natural parents, by entering an illicit relationship, waived their constitutional rights of due process and equal protection regarding custody of their child. The appellee counters that in the absence of a finding of unfitness, case law and the federal and state constitutions protect his paramount right to custody of his natural child. Disposition of the issue requires consideration of the parental preference rule in Kansas, and the recent United States Supreme Court decisions in *Quilloin v. Walcott,* 434 U.S. 246, 54 L.Ed.2d 511, 98 S. Ct. 549 (1977), and *Stanley v. Illinois,* 405 U.S. 645, 31 L.Ed.2d 551, 92 S.Ct. 1208 (1972).

It is well established in Kansas by statute and case law that natural parents are to be given preference as to custody of their children when such a contest occurs with a non-parent. *Herbst v. Herbst,* 211 Kan. 163, 505 P.2d 294; *In re Armentrout,* 207 Kan. 366, 485 P.2d 183; *In re Marsolf,* 200 Kan. 128, 434 P.2d 1010.

However, there are several ways that a parent may be deprived

of his parental rights on a permanent basis. First, K.S.A. 1977 Supp. 38-824 provides a method by which a child or children may be declared dependent and neglected and parental rights consequently severed. *In re Nelson,* 216 Kan. 271, 531 P.2d 48; *In re Bachelor,* 211 Kan. 879, 508 P.2d 862. Second, K.S.A. 60-1610(*a*) authorizes a trial court hearing a divorce or separate maintenance suit to terminate parental rights of either or both parents if the court finds that they are unfit. Finally, K.S.A. 59-2103 provides that when adoption occurs the natural parent's rights in and to said child or children shall cease. There are other instances provided for parents to divest themselves of the rights to children, but the facts in this case do not necessitate their enumeration.

The issues in this case can be narrowly framed: (1) does an unwed father have parental rights, including custody, to his child which are paramount to those of third party adoptive parents due to the parental preference rule; and (2) do the Kansas statutes dealing with adoption afford an unwed father due process and equal protection?

The United States Supreme Court clearly established in its landmark decision, *Stanley v. Illinois,* supra, that an unwed father does have parental rights in his children and that those rights are substantial. The court there stressed that the rights to conceive and raise one's own children are essential rights, and further stated, "The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley,* supra, p. 651. The *Stanley* decision was based on an appeal by an unwed father, challenging the constitutionality of the Illinois statute that declared illegitimate children wards of the state upon the death of their mother. Stanley had lived with the mother of the children intermittently for a period of 18 years, and during that time he had assumed parental responsibilities toward the three children that he fathered by her. Upon the death of the mother the State of Illinois attempted to declare the three children wards of the state without affording Stanley a hearing regarding his fitness. The Supreme Court held that Stanley had parental rights which were substantial. Balanced against those important rights was a comparatively weak state interest in avoiding a complex fitness hearing. Therefore, the court ruled that due process required that he be afforded a fitness hearing

before his parental rights were severed. The court also engaged in an analysis of equal protection, stating that the classification between wed and unwed fathers and unwed fathers and unwed mothers was invalid because it failed to meet the two-pronged test for a valid classification: it was not a logical and rational distinction, because unwed fathers may be as capable of being loving, nurturing parents as married fathers, or mothers, either married or unmarried; moreover, the classification did not further the enunciated state interest of placing children in a nurturing home atmosphere, even though this state interest was in itself a valid state objective.

Appellants attempt to distinguish the *Stanley* case, pointing out the father in *Stanley* had raised the children whereas the instant respondent has never had custody of his child. However, appellants ignore the import of *State ex rel. Lewis v. Lutheran Social Services,* 59 Wis. 2d 1, 207 N.W.2d 826 (1973). That case was decided on remand from the United States Supreme Court with instructions to grant a putative father a "fitness" hearing in light of *Stanley.* The father in *Lewis,* as the father here, had not had custody of his child. The Wisconsin court found the father could not be faulted because the adoption agency and prospective adoptive parents had kept him from his child. Fitness determined, custody was given the father. See also: *Miller v. Miller,* 504 F.2d 1067 (9th Cir. 1974); *Vanderlaan v. Vanderlaan,* 9 Ill. App. 3d 260, 292 N.E.2d 145 (1972); *Peo. ex rel. Slawek v. Covenant Child. Home,* 52 Ill. 2d 20, 284 N.E.2d 291 (1972); and *Hammack v. Wise,* 211 S.E.2d 118 (W. Va. 1975).

This court has carefully considered the most recent pronouncement of the United States Supreme Court regarding the rights of a putative father in *Quilloin v. Walcott,* supra. That case involved the petition of a stepfather, now married to the natural mother of the child, to adopt a twelve-year-old illegitimate child. The natural father of the boy sought to prevent the adoption, arguing that under *Stanley* he was entitled to a fitness hearing before his parental rights could be terminated. He had never had custody of the child and had assumed only minimal responsibilities for his welfare and support. Furthermore, he was not requesting that he be given custody of the child; he only wished to prevent the adoption. The court stated, *"Stanley* left unresolved the degree of protection a State must afford to the rights of

an unwed father in a situation, such as that presented here, in which the countervailing interests are more substantial." (p. 248.) The court emphasized the strong state interest in having children reared in a family setting, and stressed that the adoption would confirm and stabilize an already existing family unit. Balancing this strong interest against the weak interest of the father in vetoing the adoption, the court found that under the facts of the case, the natural father's rights of due process had been adequately protected by a "best interest of the child" hearing, which of course requires a lesser quantum of proof than does a fitness hearing. The natural father also advanced an equal protection argument, asserting that his interests were indistinguishable from those of a divorced or separated father or a mother no longer living with her child. The court summarily dismissed this argument, stating, "We think appellant's interests are readily distinguishable from those of a separated or divorced father, and accordingly believe that the State could permissively give appellant less veto authority than it provides to a married father." (p. 256.) In support of this statement, the court pointed to the difference in the extent of commitment to the support and welfare of the child.

It is clear that *Quilloin* does not abrogate the basic premise of the *Stanley* case; that is, that a putative father does in fact have parental rights in his child. The holding of the *Quilloin* case is actually quite narrow: the constitutional rights of an unwed father who merely seeks to veto the adoption of his child, without seeking custody of the child, are adequately protected by something less than a fitness hearing, and under the facts of that case his rights were protected by a "best interest of the child" hearing.

Applying the case and statutory law discussed above to the facts of the case at hand, we hold that Leon Scott, Jr., has parental rights to the custody of his child and under those circumstances that those rights must be given preference and will prevail over those of the adoptive parents due to the parental preference rule. *Stanley* establishes his parental rights and *Quilloin* does nothing to diminish those rights in this situation, where he appeared and asserted his desire to have the custody of his daughter soon after her birth. We agree with the *Lewis* court that a father like Leon Scott, Jr., who has been prevented from bestowing parental care on his child from the time of its birth by outside agencies (such as adoption agencies, or in this case, adoptive parents), cannot be

faulted, nor can his parental rights be lessened by virtue of his failure to perform his parental responsibilities. We think that due process requires that a putative father who appears and asserts his desire to care for his child has rights paramount to those of non-parents, unless he is found to be an unfit father in a fitness hearing. The trial court found that he was a fit parent; therefore his right to have custody of his child is clear.

We next consider the constitutional question raised in the cross-appeal by Leon Scott, Jr.; that is, whether the parental rights of a father to his child born out of wedlock are adequately protected under existing Kansas law. We think they are.

First, K.S.A. 59-2278 provides that notice of the proposed adoption be given to all interested parties. In view of the fact that the father of an illegitimate child does have parental rights, we hold today that he is an "interested party" within the meaning of the statute, and that due process and equal protection require that he be given notice of the pending adoption of his child. Actual notice should of course be given whenever possible; and when the father's identity and whereabouts are unknown and unascertainable by due diligence, constructive notice must be given in a form reasonably calculated to actually inform him of the adoption, while at the same time duly protecting the privacy rights of the mother.

However, we do not think that due process and equal protection require that the consent of a putative father be obtained before his child is adopted. K.S.A. 59-2102 requires the consent of both living parents of a legitimate child unless a parent has failed to assume parental responsibilities for a period of two consecutive years in which case his or her consent is not required. It further provides that only the mother of an illegitimate child need give her consent to the adoption of that child.

If after being given notice of the pending adoption the father appears and asserts his desire to assume parental responsibilities toward the child, his rights in the child must be given preference over those of third-party adoptive parents, unless he has failed to assume parental responsibilities for the statutory period of two years or he is found to be unfit. However, if he chooses not to appear and make known his desire to care for the child, his rights are *de minimis* and may be terminated without his consent by finalizing the adoption.

We do not think that due process requires his consent. As stated above, a father who fails to appear after being given notice has only minimal rights in his child. Balanced against these minimal rights is a strong state interest in placing children in a stable, nurturing family atmosphere. Requiring only the mother's consent when a putative father refuses to acknowledge his child by signing a consent will facilitate and expedite adoption proceedings.

Neither do we think that equal protection requires that an unwed father's consent be obtained before his child is adopted. Leon Scott, Jr., argues that the distinction between wed and unwed fathers or the distinction between unwed fathers and unwed mothers implicitly established by K.S.A. 59-2102 is constitutionally infirm. While it is true that the statute does create a classification by requiring only the consent of mothers, wed or unwed, and the consent of fathers of legitimate children (subject to the exception for those parents who fail to assume parental responsibilities for two years), we feel that the classification is not invidious. It is based on a rational and logical difference between the two groups: their respective legal relationships to the child and the accompanying difference in their responsibilities toward that child. Furthermore, the classification is logically related to and advances the legitimate state interest in facilitating the adoption of children born out of wedlock.

Under our holding today, to the extent that the father of an illegitimate child who seeks custody may veto an adoption unless he has been found unfit or has abdicated his parental responsibilities for two years, such a father is placed in the same category as the father of a legitimate child. We would emphasize that this result is based on a construction of our existing statutes which do not clearly deal with the subject, and not on any constitutional requirement. *Quilloin* makes it clear that absolute equality between the two classes of fathers is not constitutionally required, and that different treatment may be justified where proper state objectives require it. Hence our holding today is not a bar to further legislative treatment of the problem so long as it recognizes the father's right to notice and an opportunity to be heard, and makes distinctions rationally related to the objectives to be achieved.

Because we find that a putative father's rights of due process

and equal protection are satisfied by requiring that he be given notice as an interested party pursuant to K.S.A. 59-2278 and an opportunity to appear and assert his desire to assume parental responsibilities toward his child, we find the constitutional objections to the consent provisions of K.S.A. 59-2102 to be without merit. Therefore, the fact that the trial court did not rule on the issue does not constitute reversible error.

We think it wise to add that we will limit the effect of our decision to those adoptions, other than the case at hand, that occur after the date our opinion is issued. Strong policy considerations militate against giving this decision retroactive effect and thereby subjecting already existing adoptive family units to attack.

The temporary restraining order previously issued is hereby set aside. The cross-appeal is denied. Judgment of the trial court is affirmed.