*In the Matter of the Petition of* JOSEPH A. BULLEN *for a Writ of Habeas Corpus.*

### Original Proceedings in Habeas Corpus.

PETITION for a writ of *habeas corpus* in behalf of Emily C. Evans, by *Joseph A. Bullen*, against *Josephine Cantwell*, filed in this court August 22, 1882, and thereupon the writ was allowed and issued. The case was argued and submitted October 24, 1882, and was heard and decided by BREWER, J., at chambers, in the city of Leavenworth. Judgment was entered for the petitioner and the opinion filed October 31, 1882. The facts are sufficiently stated in the opinion. The case was argued orally by Mr. *H. W. Ide*, for the petitioner, and Mr. *Thomas P. Fenlon*, for the respondent.

The opinion of the court was delivered by

BREWER, J.: This is an application in *habeas corpus*, brought by Joseph A. Bullen in behalf of Emily C. Evans, a little girl of the age of six years, against Josephine Cantwell, praying that the said Emily C. Evans may be taken from the custody of the respondent and sent to England, to be placed under the care and guardianship of her grandmother, Catherine Anne Evans. The questions in the case are in many respects novel and interesting, and the conclusion to which I have come has been reached with much hesitation. The facts of the case are these:

The grandparents of the child were residents of London, England. The father of the child (their oldest son), some-

time about the year 1868, then about twenty years of age, came to this country in the hope of bettering his condition. In 1875 he married, in the city of Leavenworth, Catherine Mary Murray, and shortly thereafter returned with his wife to London, where, on the 2d day of September, 1876, Emily C. Evans was born.   On June 22, 1878, the father died, and in December of the following year the mother, with the little girl, returned to Leavenworth, in hopes of meeting a brother in this city, supposed to be in comfortable circumstances.

She was disappointed in this expectation, and being without means, proceeded to support herself and child by her own labor.   In the spring of 1880 she was taken down with consumption, was unable to do further work, and became very destitute.   In April of that year, information was received at the Home for Friendless Women, of her condition, and Mrs. Bullen and Mrs. Legate, in response thereto, proceeded to North Leavenworth and found her in the basement of a little house, in extreme destitution and weakness.   Words fail me to picture clearly her forlorn and wretched condition. Wasted by sickness, weak and feeble, she was lying on a little mattress on the floor, sheltered from the cold by only a few rags.   There was no furniture in the room, no fire, and the room was cold and damp.   Her little child was running around scarcely half clad.   These ladies removed her and her little child to the Home, where they remained a few days, and then, becoming dissatisfied with the matron, she with her child left and returned to the basement.   Here, within a few days, she was found by Mrs. O'Connor and Mrs. McFarland, who soon procured her admission to St. John's Hospital, where she remained, gradually failing, until her death, on September 5, 1880.   During these last days of feebleness and disease, she was tenderly cared for by the good Sisters in charge of the hospital, and I have no reason to doubt that everything was done by them which sympathy and love could suggest to make bright and peaceful the few last days of life, and to assuage a mother's grief at leaving her only child a lonely orphan in the world.   I pause a moment in the coldness of

judicial opinion, to say that every true man stands with un-
covered head in the presence of a kindly charity such as this
case discloses, when gentle woman, foregoing personal ease
and comfort, drawn by no tie of blood nor for old acquaint-
ance' sake, but moved alone by the impulse of a common
humanity, seeks out a wretched and helpless one, removes her
from a dreary, cold and desolate abode to surroundings of
warmth, cleanliness and comfort, smooths with tenderest touch
the pillow beneath her weary head, and brings to the heart of
a dying mother the richest of all comfort, in the assurance
that the little life she leaves behind her will be tenderly cared
for by loving hearts and hands.   Such acts redeem poor hu-
man nature from all its burden of selfishness and sin, and
make us thank God that we are brothers to such sisters.
But returning, it appears that while at the hospital, at her
solicitation proceedings were attempted for the purpose of
having her child adopted by St. Mary's Female Academy,
conducted by the Sisters of Charity of St. Vincent of Paul.
It is conceded by counsel that these proceedings were ineffec-
tual for the purpose of effecting a legal adoption, yet they
confirm a fact, abundantly established by other testimony,
that during her last days she desired and earnestly besought
the Sisters to take care of her little girl; and they, on the
other hand, comforted her dying hours with the promise to
watch over and care for her during her childhood and until
she should reach the years of maturity.   It is also true that
while she was at the Home for Friendless Women, she as
earnestly urged the good ladies there to see to it that after her
death her child be sent to its father's family in London.   I
see no reason to doubt the fact of both these requests of the
mother; nor do I see anything unnatural in her conduct in
this respect.   It seems to me it must be true, not alone be-
cause the witnesses testify to it, but because I think it is just
what a mother would do under those circumstances.   Since
the mother's death the Sisters have fulfilled their promise to
her, and have taken tender and faithful care of the little girl.
The testimony of the witnesses shows this, and the little one's

face and appearance confirm it.    Turning now to the other side, it appears that the grandfather of the child died in 1879, leaving a widow and children.   He made a will, which has since been duly probated.    By this will he left all his property in trust that the yearly income should be paid to his widow during her life or until she married again, and upon her death or marriage, to be divided among his children: this trust to continue until the expiration of twenty-one years from the death of the longest liver of his children.   He especially provided that his granddaughter, Emily C. Evans, should take the place of her father and share in his property; but coupled this provision with the condition that she be brought to England before she attained the age of seven years, and not reside abroad thereafter; that she should be brought up and remain in the Protestant faith, and not marry a Roman Catholic.    At the expiration of the trust as above indicated, the entire property was to pass to the person who should then be his heir-at-law.    And in the meantime, the death of any child increased by so much the share of all the survivors.

The testimony shows that upon the settlement of his real estate, there remained nine freeholds, now producing in the aggregate a rental of sixteen hundred and twenty dollars. It further appears that the grandmother has a comfortable home, well furnished, situated in the city of London, in which she lives with an unmarried son and two unmarried daughters. The testimony abundantly shows that her home is all that could be expected of one in ordinary circumstances of life; that the income is sufficient to maintain the family comfortably; that the characters of the inmates of the family are above reproach; that all the members of the family feel a deep interest in, and strong attachment for their little orphan relative here; and that if this child is placed in that family it will have all the advantages of personal and affectionate care, education, moral training and social position which come to those who live in ordinary walks of life.

This, I think, presents a fair summary of the facts of the

case; and from this statement I pass to a consideration of the questions presented and discussed by counsel. On the one hand, it is claimed that the grandmother has no legal right to the custody of the child; that it is never the province of the court to expatriate a citizen, even though that citizen be a mere child; that the expressed wishes of the dying mother should be respected; and that beyond all these matters, the child is at present happily situated, in good hands, kindly and properly cared for, and that there is not under the testimony enough to satisfy that the change asked for would substantially better its condition, or promote its welfare. On the other hand, it is contended that upon a change, the little girl will obtain that which she now lacks — the surroundings and blessings of a home, where personal attachment and not official duty is the controlling spirit; that she will secure a property sufficient for her support, and which will render her comparatively independent, and that therefore the interest of the child, which in all such cases as this is the paramount consideration, demands the change. Clearly the grandmother has no right to the child; there is on her part no legal obligation to support it, and therefore no legal right to its custody. It cannot be said that the child is illegally restrained of its liberty, deliverance from which, as counsel well say, was in the first instance the purpose and object of *habeas corpus.* Yet, as to children at least, the scope of the writ has been largely extended. Beyond the mere matter of forcible restraint, of technically illegal confinement, the courts will inquire whether the surroundings of the child are such as make for its highest welfare, and will do for it that which such welfare compels. In such cases, it is in fact the petition of the child; and I know of no duty more delicate and responsible than that which such petition places upon a judge. Take the case before me: The parents of the child, the ones who by every law, human and divine, are charged with the sacred duty of protection, support, care and promotion of its highest welfare, are both dead. By this petition, in effect she comes to me and says: "They who were my guardians

50—28 KAS.

by nature have passed away.   My feeble steps are just com-
mencing the walk of life; I know nothing of the world and
its ways; I cannot tell what will be best for me; I appeal to
you to take the place of father and mother, to decide for me,
who am too young to decide for myself, and to place me
where I can receive the highest advantages; and where the
surroundings of my life shall win for it its best and highest
fruition; and so that when I reach the years of womanhood,
I can look back to this hour and this decision, and say, 'I
thank you.'"

Do I demean myself by saying I shrink from this respon-
sibility?   I cannot agree with counsel, that it is never the
province of the court to expatriate a citizen.   In some cases
I think the duty so to do is clear and absolute.   As, for in-
stance, where parents moving to a foreign country and leaving
their little child here for awhile, come back to claim it and
are hindered by those who have it in possession.   Neverthe-
less, it is a matter always to be considered.   With pardonable
partiality, we look upon our own land, its laws, institutions
and social life, as the best; and not lightly should a child be
deprived of the benefit of them.   Yet we may not ignore the
fact that the mother country is a land of liberty and law, of
education and social refinement, of morality and religion;
and it would be wrong to make the matter of expatriation
an excuse for depriving this little girl of that which would
promote her welfare.   Neither is it clear that sending this
child to England would be technically an expatriation.   The
child was not born in this country, and there is nothing in
the testimony which shows that either parent ever ceased to
be an alien, or became a citizen.   Further, the grandmother
has been appointed by the courts of England the guardian of
this little girl, and if now this petition is granted she will
pass under the special care of those courts, the faithfulness of
whose watch in cases of this kind is a matter of universal
recognition.   But I place comparatively little stress on this,
and turn to the paramount question and ask, What will be
best for the welfare of the child?   And looking at this ques-

tion in the light of experience, and testing it by the generally
recognized facts of society and life, I can but think that the
welfare of the child, its best interests, will be promoted by
granting the prayer of the petition.    Two principal reasons
control in my mind: First, her life here would be a life in an
institution; there, a life in a home.    I need not stop to recount
the numberless blessings which home gives to a child, es-
pecially a female child.    The common judgment of all voices
the truth, that the best development of a young life is within
the sacred precincts of a home.    No institution, however cul-
tured and refined its instructors, however pure its life, how-
ever faithful and devoted all its officers and teachers to the
care, nurture and education of the many children within its
walls, will give that sweet, gentle and attractive development
to a young girl, that comes from the personal and affectionate
training of a home.    There is something of the same difference
as between hotel life and home life.    There is more pub-
licity to the one; more privacy to the other.    There is some-
thing official, as it were, in one, and personal in the other.
The varied graces of true womanly nature ripen more sweetly
and more surely in one than in the other.    I would not de-
tract in the least from the advantages which these institutions
afford to the young.    I believe they are a large blessing, and
that even for those children who have homes, an occasional
and temporary sojourn in one is of lasting and incalculable
benefit to the development of the child.    But when it comes
to the question of a life wholly within an institution, and one
wholly a home life, I think all will agree that the latter is to
be preferred.    I think every parent, when asked whether he
or she would have his or her child forego during all the
years of childhood the blessings of a home life, for the sake
of the advantages furnished by even the best institution in
the world, would unhesitatingly answer in the negative.    And
I doubt not the good Sisters in this institution, many of whom
look back with sacred reverence to the home life of their child-
hood, with all their pride in and affection for that institution
to which they have so sacredly devoted their lives, still feel

in their inmost hearts that that home life was a blessing which nothing else could equal to their early days.

Second, there is a pecuniary consideration. I am not so sordid as to believe that money is the one thing to be regarded; but other things being equal, that certainly is a matter to be considered. If she remains here she will come to maturity without means, and dependent solely on her own labor or the help of others. There she will have a little property — not a great wealth, it is true, but enough to keep want away and to enable her to act freely in her choice of place and work in life. There is also a possibility, though perhaps only a remote one, of her becoming through the death of others the heir to quite a property. It is true there are conditions attached to the receiving of that property which to my mind are odious and unjust. They indicate a bigoted spirit on the part of the testator, so foreign to the free and catholic spirit of to-day, that every true man must condemn them. Yet this little girl ought to have the opportunity to decide for herself, when she comes to maturity, whether she will accept or reject the property burdened with those conditions. To-day she knows nothing of the value of the property, or the meaning and import of the conditions. It would be wrong to refuse her the privilege of an intelligent choice. When she arrives at years of discretion she may prefer to accept her mother's faith and reject her grandfather's proffered bequest, or she may prefer to accept the bequest and walk in the faith of her father; but unless the prayer of the petition be granted, she will never have the opportunity of accepting it.

Counsel have made a most eloquent appeal that the wish of a dying mother as to the future of her child should be respected. The precious recollections of my own childhood, with all the shapings of my life through the gentle influence of a loving mother's care, from its first helping my infant steps, up through all the sunny days of childhood, to her dying blessing in manhood's morning hour, send this appeal home to my heart with tremendous force. But I interpret

the mother's conduct and desire thus: She was a stranger in a strange land, alone, and dying. The uppermost thought in her heart was the future of her child. When with the ladies of the Home, she turned to her husband's family home as the surest and most certain place of refuge for her orphan child, and she begged the ladies to see that it was sent thither. Afterward, when she passed into the kindly care of the good Sisters, and found what faithful friends they were to her in her time of need, she believed the same kind care would be extended to her little one, and begged of them to take it. In other words, thinking only of her child, she ever turned to that which at the time seemed the nearest and surest succor for its helplessness, and prayed for the care which she was no longer able to give it. Evidently, from a letter written by her while at the hospital shortly before her death, her affection for her husband's family and her friends was strong to the last, and she committed her little one to the care of the respondent through no aversion to them.

If from the calm and peaceful heights of heaven the departed look back with loving interest upon the things of earth, I can but think that she will look down approvingly upon the conclusion I have reached. I know she will approve the spirit with which I act, even though she may not the wisdom of my conclusion. The order then that will be made, is: that the prayer of the petition be granted, and the child be given into the custody of Mr. Bullen, to be by him sent to its grandmother in London.

As the opposition of the respondent to this petition has not been from any factious spirit, but under a sense of obligation springing from a promise to a dying mother, I think the costs of this proceeding should be paid by the petitioner.

All the Justices concurring.