No. 43,979

Mary Lennon, *Appellant,* v. The State of Kansas, and Kay Marie Lennon, a Minor, by E. Keith Beard, Guardian Ad Litem, *Appellees.*

(396 P. 2d 290)

Opinion filed November 7, 1964.

*Donald E. Shultz,* of Dodge City, argued the cause, and was on the briefs for the appellant.

*E. Keith Beard* and *Bradley Post,* County Attorney, both of Meade, argued the cause, and were on the briefs for the appellees.

The opinion of the court was delivered by

Fontron, J.: This case originated in the juvenile court of Meade County, Kansas, pursuant to the provisions of the Juvenile Code, G. S. 1961 Supp., 38-801, *et seq.* On December 21, 1962, a verified petition was filed in juvenile court alleging that Kay Marie Lennon, a minor child under the age of sixteen years, was dependent and neglected by virtue of being without proper care, custody and support, and praying she be declared a dependent and neglected child, and that the court exercise the state's parental power and permanently deprive the mother, Mary Lennon, of her parental rights.

Although the record on appeal is silent as to what occurred in juvenile court, we learn from the briefs that the judge of that court found Kay Marie to be dependent and neglected and ordered her placed in the custody of the State Department of Social Welfare. This decision, again according to the briefs, was appealed by the child's mother, Mary Lennon, to the Meade county district court, where Donald E. Schultz, a Dodge City attorney, was appointed to represent the mother and E. Keith Beard, a lawyer of Meade, was appointed guardian *ad litem* for the child.

At the conclusion of the trial in district court, at which appellant's motion for a jury was denied, the court, after finding Kay Marie Lennon to be a dependent and neglected child within the purview of the statute, severed all parental rights and committed the child to the custody of the State Department of Social Welfare. The present appeal was then perfected by the mother.

The stipulated narrative of facts contained in the record discloses the following: The mother (sometimes called Mary herein) lives in a substandard home, is afflicted with a decided speech defect resulting from a childhood injury, has few friends and is more or less ostracized by society. Although contradicted by Mary's mother and two of her acquaintances, there is substantial evidence that Mary is ill groomed, careless of appearance, cleanliness and personal hygiene, and exudes offensive body odor. Her income derives from monthly payments of $123.35 from the Veteran's Administration and $22.00 from the Meade county welfare department.

Mary has thrice been married, first in 1946 to a sometime alcoholic, from whom she was divorced in 1949. The two children of this marriage were taken from both their parents by the district court shortly after the divorce and have been reared by other parties since that time. Mary's second husband, whom she married in 1952, killed the only child of that marriage and was sentenced to prison upon pleading guilty to second degree murder. Mary was hospitalized from the effects of trying to defend her five-month-old baby and she aided in the prosecution of her guilty husband. The second marriage ended in divorce in 1954 and in 1955 Mary took unto herself a third husband, J. T. Lennon, a double leg amputee. This couple has not lived together since at least June, 1961, when Lennon, who then was in Port Arthur, Texas, sent Mary to live in Meade, Kansas.

Two children were born of the Lennon marriage, both of whom

make their home with Mary. The girl, who now is six years old, imitates her mother's speech defect, while Mary accompanies her son John, age seven, to and from school because children have knocked him down and torn his pants. Although there is conflicting evidence as to Mary's control and management of the two children, it is fair to conclude they are reasonably clean and adequately fed. The evidence leaves no doubt that Mary loves both children, and the new baby as well.

Mary became pregnant after her separation from Lennon, and Kay Marie, the subject of this action, was born December 6, 1962, in Meade. Mary named a Walter Vanderpool as the father of the child, stating that she knew this because she had "marked it on a calendar." Despite Mary's pathetic belief that Walter will help and wants to marry her, naught appears of record to suggest any such nobility of character on his part, and the sheriff has told Mary that the estimable Mr. Vanderpool has said he wanted nothing to do with hapless Mary.

Shortly after Kay Marie's birth, Mary signed a paper denominated "Release of Child," under circumstances which suggest considerable urging on the part of officials, and at a time when Mary was undergoing much mental stress and hovered on the verge of tears. Since signing the document, under which the Social Welfare Department has been holding the child pending the outcome of this action, Mary has been emotionally upset, subject to spells of nausea, and even hospitalized on occasion.

Sometime between 1949 and 1952, Mary was discovered one night cutting a hole in the back door of a bank and said she was trying to get her money out. When told by the sheriff that she would have to go with him, Mary broke and ran up a stairway, then turned on the officer and struck him several times with a stick or broom handle. On another occasion, in about 1955, the then current sheriff was called to a beer parlor where Mary was threatening to take her own life, but was talked out of that notion.

Finally, the evidence shows that Mary had a violent temper. Following a custody hearing over the two older children, Mary physically attacked Judge Karl Miller, the presiding jurist, in a hall outside the courtroom. And at the conclusion of the trial of the present case in county (juvenile) court, Mary attempted to choke the judge of that court because her baby was being taken, and she had to be restrained.

The first of several points raised by Mary in her appeal relates to the sufficiency of the amended petition which, in substance, alleges that the occupation, environment or association of Mary, and that which Mary *would* provide, *would be* injurious to Kay Marie's welfare. So far as pertinent to this case, G. S. 1961 Supp., 38-802 (g) (3), (4) defines a dependent and neglected child as one less than sixteen (16) years old "whose occupation, environment or association *is* injurious to his welfare;" or ". . . *is* otherwise without proper care, custody or support; . . ." (Emphasis supplied.)

The appellant insists that no offense is charged under the statute, claiming that the future rather than the present tense of the verb "be" is used in the amended petition. We consider this objection a mere quibble over semantics, and without substance. Under present usage, we believe that the verb form "would be" may refer to the present as well as the future. In any event, the appellant can in noway be mislead as to the nature of the charge nor, in our opinion, does the language deviate in any vital respect from that of the statute.

Mary next contends that the charge contained in the petition is, as to her, criminal in nature and that she was entitled to have the cause tried by jury. This contention cannot be sustained. In the case of *In re Turner*, 94 Kan. 115, 145 Pac. 871, this court had occasion to consider proceedings had under the juvenile court act of 1905 (Laws 1905, ch. 190) where the identical question was raised, and rejected. In the opinion, the court said:

"The authorities are nearly all to the effect that statutes of this kind are parental rather than criminal, so that a jury may not be demanded as a matter of constitutional right. This, together with the express declaration of the closing section, that all proceedings, orders and judgments shall be deemed to have been taken and done in the exercise of the parental power of the state, makes it clear that neither the stigma nor the penalty of crime should be held to accompany the proceeding and order in this case." (pp. 121, 122.)

In *Hall v. Brown*, 129 Kan. 859, 284 Pac. 396, we held:

"On an appeal by a child from the juvenile court to the district court, under the law governing the custody and control of delinquent, dependent and neglected children under sixteen years of age, a trial by jury cannot be demanded as a matter of right." (Syl.)

In the more recent case of *In re McCoy*, 184 Kan. 1, 334 P. 2d 820, this court said:

". . . Statutes of this kind are *parental* and as such a jury may not be demanded as a matter of constitutional right. . . . " (p. 9.)

Our conclusion that the proceeding is not criminal in nature disposes of appellant's next claim that a higher degree of proof is required in a case of this nature than a mere preponderance of the evidence.

At the commencement of the hearing, the district court, on motion of the guardian *ad litem,* and in the exercise of authority granted in G. S. 1961 Supp., 38-822, excluded from the courtroom all persons except counsel for interested parties, officers of the court, the witness testifying, and the appellant.

Complaint is made of the court's action in overruling Mary's motion to permit her mother to remain in the courtroom because of Mary's speech impediment. The granting or refusal of a request to exclude witnesses from the courtroom rests in the sound judicial discretion of the court, (*West v. West,* 135 Kan. 223, 9 P. 2d 981) and while we believe that Mary's request might well have been granted, we do not believe that its rejection, under the circumstances shown here, constituted an abuse of discretion. The court expressly stated that counsel would be allowed such time as he needed to confer with his client through her mother, and the record nowhere reveals that he was at any time denied such opportunity.

The appellant's complaint that error was committed in the admission of remote and irrelevant evidence will be considered in connection with what appears to be her most serious contentions, *i. e.,* that the trial court erred in overruling her demurrer to the state's evidence and that the court's findings and conclusions were contrary to the law and the evidence. These contentions strike at the hear of this lawsuit, and as we examine them, we must ever bear in mind the purpose which underlies the Juvenile Code and the beneficent objectives which the code seeks to attain. These objectives are well expressed in 38-801, *supra,* which provides:

"This act shall be liberally construed, to the end that each child coming within its provisions shall receive such care, custody, guidance, control and discipline, preferably in his own home, as will best serve the child's welfare and the best interests of the state. In no case shall any order, judgment or decree of the juvenile court, in any proceedings under the provisions of this act, be deemed or held to import a criminal act on the part of any child; but all proceedings, orders, judgments and decrees shall be deemed to have been taken and done in the exercise of the parental power of the state. This section shall not apply to proceedings under section 30 [38-830] of this act."

The statute is but a legislative expression of the concern which the people of this state have always had for the welfare of children.

This court early gave voice to the public feeling in this regard. Speaking for the court in the case of *In re Bullen*, 28 Kan. 781, Justice Brewer posed the paramount question:

". . . What will be best for the welfare of the child? . . ." (p. 786.)

Like a vivid, vital strand, this concept of what is best for the child runs through the tapestry woven from our many decisions dealing with child custody, care and placement. In *Pinney v. Sulzen*, 91 Kan. 407, 137 Pac. 987, cited in the recent case of *In re Stafford*, 193 Kan. 120, 392 P. 2d 140, this court said:

"While the *prima facie* right to the custody of the child is in the parent it is not an unconditional right. The well-being of the child is the prime consideration, and courts do not hesitate to take a child from its parents and give it to a stranger if the parents treat the child with cruelty, keep it in vicious or disreputable surroundings, or are unfit to be entrusted with its custody and control by reason of their habits, character or condition. . . ." (p. 412.)

Little doubt can linger in the mind of one who reads this record that Kay Marie fairly fits the statutory definition of a dependent and neglected child. A product of illicit love, she would, indeed, face a dismal and distressing future in the only environment which her unfortunate mother appears capable of providing. Mary's record throughout her adult years reveals gross instability and lack of moral fiber. The evidence to which the appellant objected pertained to a continuing course of conduct tending to prove Mary's character in such regard, and we believe it was relevant and admissible for such purpose. (See Slough, Relevancy Unraveled, 5 Kan. L. Rev. 404 [1957].) The question here is whether the environment surrounding her mother's home would be injurious to Kay Marie's welfare, and on this point the manner in which Mary has conducted herself in the past and what her past behavior evidences as to her character becomes material, even though the past which is revealed may stretch back across a good many years. (*Coates v. Sulau*, 46 Kan. 341, 26 Pac. 720.)

No good purpose would be served by again detailing the facts or further recapitulating the evidence. We need only say that we find it difficult to envision a situation which could prove more inimical to a child's chances in life, or more injurious to its future welfare, than that shown to exist in the Lennon menage of which Mary is its sole head, counselor and guide. In so saying, we do not discount the value of love and affection, which we believe Mary would provide her child within the limits of her capacity.

However, love, alone, is not sufficient. In our opinion, no amount of affection would compensate for, much less overcome, Mary's personal shortcomings and character defects which necessarily find reflection in the atmosphere of the home.

We readily agree that parental rights are not to be considered lightly, and this court has always been diligent in their protection. (*Swarens v. Swarens*, 78 Kan. 682, 97 Pac. 968; *Pinney v. Sulzen*, supra.) However, when the welfare of a child so demands, the rights of its parents must yield to the paramount right of their off-spring to receive proper parental care, guidance and control. Where such be the case, the state, in the rightful exercise of its power as *parens patriae*, has the duty to intervene on behalf of the child in furtherance of its legitimate interests. (*In re McCoy*, supra.)

While we necessarily have great compassion for the unfortunate mother, who must be viewed as the tragic victim of many of life's cruelties and vicissitudes, we cannot let our sympathy for her blind us to the critical situation in which the helpless Kay Marie finds herself. There is ample competent evidence, not only to justify the trial court in overruling Mary's demurrer, but also to support the finding and judgment of that court that Kay Marie Lennon is a dependent and neglected child within the meaning of the code.

The judgment of the court below must be affirmed.