No. 50,077

STATE OF KANSAS, *ex rel.*, JOSEPH P. O'SULLIVAN, COUNTY ATTORNEY, RENO COUNTY, KANSAS, *Appellee,* v. HEART MINISTRIES, INC.; VICTORY VILLAGE HOME FOR GIRLS; WILLIAM COWELL and CAROL COWELL, AS DIRECTORS AND OPERATORS OF VICTORY VILLAGE HOME FOR GIRLS, AND AS INDIVIDUALS, *Appellants.*

(607 P.2d 1102)

Opinion filed March 1, 1980.

*Lester C. Arvin,* of Arvin, Arvin & Busey, Chartered, of Wichita, argued the cause, and *Rodney H. Busey* and *Mark A. Buck,* of the same firm, were with him on the brief for the appellants.

*Joseph P. O'Sullivan,* county attorney, argued the cause, and *Robert T. Stephan,*

attorney general, *Bradley J. Smoot,* deputy attorney general, and *Reid Stacey,* assistant attorney general, were with him on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: Heart Ministries, Inc. and William and Carol Cowell appeal from the issuance of a permanent injunction against them by the trial court. The propriety of that order is attacked on numerous grounds, one of which we believe to be determinative: whether the licensing requirement of K.S.A. 1979 Supp. 65-501 and the fee requirements of K.S.A. 1979 Supp. 65-505 violate appellants' rights under the "free exercise" clause of the First Amendment to the Constitution of the United States.

The State, through the county attorney of Reno County, brought this action in June, 1977, praying for an injunction prohibiting the defendants, Heart Ministries and the Reverend and Mrs. Cowell, from operating, maintaining, or holding themselves out to the public as operating or maintaining a maternity hospital, a home, a boarding home, or a placement agency for juveniles under the age of 16, until defendants obtain a state license for such operations. The petition also sought an injunction prohibiting defendants from bringing children under the age of 18 into Kansas for placement in foster care in this state until defendants comply with the Interstate Compact on the Placement of Children, K.S.A. 1979 Supp. 38-1202.

Victory Village Home for Girls was originally designated as a defendant. The trial court found that Victory Village Home for Girls is not a separate legal entity, but merely a name used by Heart Ministries. Victory Village Home for Girls was thereupon stricken as a party defendant from this lawsuit. No appeal is taken from that order.

We now turn to the relevant facts. Reverend Cowell, a native Kansan, graduated from Kansas State University in 1961 with a degree in agronomy. Thereafter he attended Wheaton School of Theology in Chicago, graduating with the degree of Bachelor of Divinity in 1965. Mrs. Cowell attended both Moody Bible College and Wheaton, but did not complete her work for a degree.

In 1965, the couple returned to Kansas. Reverend Cowell first had a pastorate in Hoisington, then in 1968 he accepted the call to a church in Marion. It was there that he and Mrs. Cowell became interested in helping children. In 1971, Heart Ministries was incorporated as a non-profit corporation. The nature of its business is set forth in its articles of incorporation:

" '[T]o provide housing, facilities, care and detention for wayward, homeless or delinquent individuals . . . to preach the Word of God, lead individuals to trust Christ as Savior and Lord, reach out with His love and compassion to those whose lives have been broken and marred by sin, and thus rescue the perishing. As the Lord leads, homes shall be established and scriptural methods shall be used as necessary in order to accomplish this purpose.' "

Reverend Cowell became interested in establishing a home for unwed mothers at Marion. Application was made for a state license, but the proposed facility did not conform to standards relative to financing, social services, and fire safety. Extensive and expensive modification to the structure would have been required. After much correspondence, several conferences, and inspection by various state and local officials, plans for the Marion County facility were abandoned. The Marion County land was sold, since licensing did not appear feasible.

Heart Ministries then purchased a tract of 117 acres located about 7 miles east of Hutchinson, in Reno County, in November, 1972. This tract is known as Victory Village. Reverend and Mrs. Cowell moved there, and at first occupied a trailer house; later a parsonage was built, and a large multipurpose metal building, housing a chapel, church offices, a radio studio, and a school, was completed. Construction of a two-story masonry structure, designed as a dormitory for girls and containing between eight and nine thousand square feet, was commenced in the summer of 1973. There were numerous contacts with state authorities as to construction, sanitation, area per resident, and the like, and it appears that the building is being erected in compliance with state standards and regulations. Construction was not complete at the time of trial in November, 1977.

During the period from 1972 to 1977, the defendants operated the Victory Village Home for Girls, and mention of that function or ministry was made by Reverend Cowell on his radio ministry, a program carried by six stations in a number of states. Twenty-one girls were placed in the home at various times by their parents or guardians; they came from Arizona, Arkansas, Colorado, Kansas, Missouri, Oklahoma, and Texas; the girls stayed an average of from nine months to a year. Housing was provided in private homes, some being trailers in the Village and others being homes nearby. Some of the girls stayed with Reverend and Mrs. Cowell; four girls were staying with them shortly before this

action was filed. Some of the trailer homes were licensed as foster homes by the owners, but the Cowell home was never licensed. About 1972, Reverend Cowell applied for a "foster home" license so that he could care for four or fewer girls in his own home; he withdrew that application before it was acted upon. No other application for any type of girls' home was made by the defendants, nor was application made by them to operate a placement agency.

The ministry for girls as carried on by the defendants includes caring for them and providing food and shelter, schooling, counseling, and religious training. A school is operated at the Village. It uses the Accelerated Christian Education System and is not state accredited, although an expert testified that the system fulfills state requirements. Thirteen girls, in grades one through eight, were attending the school at the time of trial.

In June, 1977, four girls who were living in the Cowell's home and attending defendants' school were taken into custody by juvenile authorities on the complaint of an out-of-state acquaintance of one of the girls. Two of the girls were 14 years of age, two 16; two lived in Kansas, one in Nebraska and one in Oklahoma. All were returned to their parents. This action was filed shortly thereafter.

We turn now to the applicable statutes and regulations. The Interstate Compact on the Placement of Children was adopted by the Kansas Legislature in 1976. It appears as K.S.A. 1979 Supp. 38-1202 *et seq.*, and provides in substance that no "sending agency," which designation includes private persons, may send, bring, or cause to be sent or brought, any child into this state for placement in foster care without the consent of the appropriate public authorities in this state.

K.S.A. 1979 Supp. 65-501 declares it to be unlawful "for any person, firm, corporation or association to conduct or maintain a maternity hospital or home, or a boarding, receiving or detention home for children under sixteen (16) years of age without having a license therefor from the secretary of health and environment."

K.S.A. 65-502 defines maternity hospital or home.

K.S.A. 1979 Supp. 65-503 defines a boarding home for children in part as a house or other place conducted or maintained by anyone who (1) "advertises or holds himself or herself out as conducting a boarding house or home for children under sixteen

(16) years of age"; or (2) "has in his or her control or custody one or more children under sixteen (16) years of age unattended by parent or guardian for the purpose of providing such children with food or lodging, or both, except children related to him or her by blood or marriage, or legal adoption."

K.S.A. 1979 Supp. 65-504 provides for the issuance of annual licenses for a specified number of residents by the secretary. Both an inspection of the facility by the secretary of health and environment, and the approval of the secretary of social and rehabilitation services, are required before the license may issue. Provisions are included for temporary licensing. Whenever a license is denied or revoked, the secretary of health and environment, the issuing authority, must issue an order stating the reasons for such action. Provision is made for the appeal to the district court of either denial or revocation of a license.

K.S.A. 1979 Supp. 65-505 fixes license fees at $2 for homes having 4 or fewer residents, and at $5 for homes having 5 or more residents.

K.S.A. 1979 Supp. 65-506 prohibits the placing of children under the age of 16 years in any unlicensed maternity home or home for children.

K.S.A. 1979 Supp. 65-507 requires maternity homes and homes for children to keep records of each child received and cared for therein.

K.S.A. 1979 Supp. 65-508 sets forth certain requirements for the physical facilities, and it authorizes the secretary of health and environment, with the cooperation of the secretary of social and rehabilitation services, to develop and adopt rules and regulations for the operation and maintenance of maternity homes and homes for children, designed to promote the health, safety and welfare of the residents. K.S.A. 1979 Supp. 65-512 requires the secretary of health and environment to inspect each facility at least once every six months.

The regulations, as would be expected, are lengthy and quite detailed, and we will make no attempt to summarize all of them here. The various categories of care centers for children are differentiated in the regulations by size: *residential centers* are those which provide 24-hour a day care for more than 10 children; *group boarding homes,* for not less than 5 nor more than 10 children; and *foster homes,* for four or fewer children. K.A.R.

28-4-75, 28-4-250, 28-4-300. The regulations for residential centers and for group boarding homes are almost identical; the regulations for foster homes are much less detailed and less restrictive. Thirteen children were under the care of Heart Ministries at the time this case arose. The dormitory under construction would obviously house and accommodate more than four children. Further, the regulations targeted in the presentation of defendants' case were those relating to the larger categories. Therefore we are concerned only with the regulations pertaining to residential centers or group boarding homes.

The regulations on licensing procedures require the submission of a written proposal detailing the purpose of the center, the administration, financing, staffing, and services to be offered, and must include plans for all buildings to be used. The administration section requires that the applicant or its parent body be a nonprofit corporation. The governing board must have at least six members representing a variety of community interests. Finances must be sound and adequate; an annual financial statement must be submitted to the secretary of social and rehabilitation services; and the financial records must be audited annually by a public accountant. Children may not be used in soliciting funds. Liability and casualty insurance is required. Personnel policies must be adopted and records maintained. Training must be provided for staff; minimum qualifications for staff are set forth; health certificates are required; sex offenders or those convicted of felony involving intentional bodily harm may not be employed. Medical and other consultant services must be provided. Records must be kept on each resident and each employee. Discipline which is humiliating, frightening, or physically harmful shall not be used. Corporal punishment, defined as any method of punishment which inflicts pain, is prohibited. Health care, mental health, nutrition, and accident prevention policies are spelled out. Environmental standards cover the physical facilities, construction, location, lighting, heating, food service, water supply, sewage, laundry, and swimming pool safety.

A child placement agency is defined in K.A.R. 28-4-160 as a child or family welfare agency which receives children for services which may lead to placement in institutions or in foster family homes for boarding care, free care, or adoption. Various regulations governing such an agency follow. Licensing is required.

The activities of the defendants challenged by the State include acting as a child placement agency without a license; acting as a residential center, group boarding home, or foster home, or any of them, without an appropriate State license; and bringing children into Kansas for placement in violation of the Interstate Compact. Defendants, by interrogatories submitted before trial, admitted that they hold no such licenses, and that they have provided board and room for many girls under the age of 16 who were not related to the Cowells. They concluded their answers by stating:

"Defendants do not intend to apply for any license to operate a foster home or a boarding home for children or to abide by any rules or regulations adopted by the Kansas Department of Health and Environment, and the Department of Social and Rehabilitative Services which would make them disobedient to God's command. The defendants will meet any reasonable regulation that is not against their religious convictions."

During trial, Reverend Cowell testified that he had no religious objection to reasonable regulations pertaining to health and safety, but he objects on religious grounds to many of the regulations. He believes that corporal punishment is required by scripture; this includes beating children with belts and boards. He objects to the requirement that sound and sufficient finances be disclosed, that an annual financial statement be prepared, and that the accounts be audited, believing that God will provide. He interprets the regulations to require a budget and pledges, which is not consistent with his faith. The requirement of the keeping of records of each child and the disclosure of those records to the State, would be a breach of ethics of his Christian ministry. He objects to the requirement that medical and other professional consultants be arranged for in advance, believing that as the need arises someone can be found to meet that particular need. Finally, he reads the regulations as prohibiting the defendants from attempting to convert to the Christian faith all residents in the Village, a duty which is Biblically imposed upon all Christians.

Reverend Cowell testified that he believes that "everything we do twenty-four hours a day, seven days a week, in the parsonage, in the church, on the grounds, and Victory Village or wherever we go from there, is covered by convictional commandment from God's Word, the Bible." Victory Village Home for Girls is one aspect of the total ministry. Other aspects include the church, the

school for the girls, counseling the girls as well as others, evangelism, and the radio ministry.

The trial court carefully reviewed the evidence, read the dozens of Biblical and legal citations submitted, and entered its order by way of a lengthy and comprehensive memorandum of decision filed April 21, 1978. The court found that the religious convictions of the Reverend Cowell and those participating in the work of Heart Ministries, Inc. were legitimate, truly held, and consistently practiced, in spite of the fact that any conflict between those beliefs and the state regulations was not asserted by the defendants until after this action was filed. The court found that the State has a genuine interest in the care, treatment and protection of children; and that what is involved is a balancing of the-interest of the defendants in the free exercise of their religion against the governmental interest of the State in the welfare of the children. The court said:

"[T]he Court notes that only since the filing of the Petition herein have the Defendants complained of their resistance to obtaining a license on religious grounds. The Court notes that since 1971 the Defendants have been involved, on different occasions, in the housing of pregnant girls; the placing of the offspring up for adoption; the housing of children under sixteen years of age, both from Kansas and from without; the beating of children; the restriction of childrens' mail, communication, mode of dress, freedom of religion, and even limiting their education; the placing of children from outside the State of Kansas to foster homes in this State; using children to raise funds for its ministry.

"In all of these incidents mentioned in the last paragraph, the State has a legitimate interest. The requiring of a license for persons who are to operate a foster home, a boarding home, or a residential center for children under sixteen is, in this Court's opinion, a legitimate exercise of the police power of the State. It is a *compelling* State interest, and one which is reasonable. The State has a right to determine the purpose of such homes; their administration; their financing, services, and staffing; the safety of children is of paramount interest to the State."

The court then concluded that the statutes and regulations were constitutional and valid, and the court permanently enjoined the defendants from "operating, maintaining, or holding themselves out to the public as operating or maintaining a maternity hospital, or home, or boarding home as defined by K.S.A. 65-502 and K.S.A. 65-503; or from acting as a placement agency for juveniles under the age of sixteen (16) . . . [or from] bringing into or receiving within the State of Kansas children under the age of eighteen (18) for placement in foster homes or foster care within this State . . . until further order of the Court."

The first question before us is whether the State has an interest in the children's care, when provided by other than parents, sufficient to warrant control by way of license, inspection, and regulations. In the case of *In re Turner,* 94 Kan. 115, 145 Pac. 871 (1915), we considered the juvenile court act passed in 1905, L. 1905, ch. 190, later codified as G.S. 1909, 5099-5113. We said:

"[The Act] is an assertion upon the part of the state of its right to exercise its power of *parens patriae* for the welfare of such of its minor citizens as are deprived of proper parental control and oversight . . . . These words, meaning 'Father of his country,' were applied originally to the king and are used to designate the state, referring to its sovereign power of guardianship over persons under disability." (p. 120.)

We quoted Mr. Justice Taney's concurring opinion in *Fontain v. Ravenel,* 58 U.S. 369, 393, 15 L.Ed. 80 (1854), recognizing that these powers, which belong to the sovereign as *parens patriae,* are not conferred upon United States Courts, but remain with the State. We also cited *Wisconsin Industrial School for Girls v. Clark County,* 103 Wis. 651, 79 N.W. 422 (1899), and we quoted the following passage from that opinion:

" 'Every statute which is designed to give protection, care, and training to children, as a needed substitute for parental authority and performance of parental duty, is but a recognition of the duty of the state, as the legitimate guardian and protector of children where other guardianship fails. No constitutional right is violated, but one of the most important duties which organized society owes its helpless members is performed just in the measure that the law is framed with wisdom and is carefully administered.' (p. 665.)" (94 Kan. at 121.)

*In re Turner* is followed in our later cases. *In re McCoy,* 184 Kan. 1, 9, 334 P.2d 820 (1959); *Lennon v. State,* 193 Kan. 685, 691, 396 P.2d 290 (1964); *In re Johnson,* 214 Kan. 780, 522 P.2d 330 (1974); and see *In re Kerns,* 225 Kan. 746, 751, 594 P.2d 187 (1979). In *Lennon,* speaking of the purposes underlying the juvenile code, K.S.A. 38-801 *et seq.,* we said:

"The statute is but a legislative expression of the concern which the people of this state have always had for the welfare of children. This court early gave voice to the public feeling in this regard. Speaking for the court in the case of *In re Bullen,* 28 Kan. 781, Justice Brewer posed the paramount question:

" '. . . What will be best for the welfare of the child? . . .' (p. 786.)

"Like a vivid, vital strand, this concept of what is best for the child runs through the tapestry woven from our many decisions dealing with child custody, care and placement." (193 Kan. at 689-690.)

The statutes and regulations to which the defendants object are

all designed to protect, in one way or another, the children who are cared for in homes other than those provided by their parents. The licensing and inspection, as well as the myriad regulations, are concerned with the care and well being of the children—their shelter, health, diet, safety, education, and general welfare are of prime concern.

The parents of the children in the defendants' facilities are absent and cannot look after them. The children are dependent upon the operators and employees of the home in which they reside for food, care, and shelter. Their welfare is a matter of State concern. Historically the State has protected children from injury and injustice, from harmful employment and environment, and from abuse in all forms. Under the doctrine of *parens patriae,* the State has power to legislate for the protection of minor children within its jurisdiction. The rule is stated in 43 C.J.S., Infants § 5, as follows:

"The state has an interest in protecting the welfare of infants, within its borders; and the state, as parens patriae, has the duty to see that every child within its borders receives proper care and treatment. The power of the state to control the activities and conduct of children reaches beyond the scope of its authority over adults.

"The power of state, as parens patriae, is not an unlimited and arbitrary one, and is exercised only in cases where the child is destitute of that parental care and protection to which he is entitled. To effect such power the legislature may and should make reasonable regulations tending toward the protection and welfare of the child; and so important is this governmental function that the limitations of the constitution are to be so construed, if possible, as not to interfere with its legitimate exercise. Such legislation is beneficial and remedial, not criminal in its nature, and entitled to favorable and liberal construction." (pp. 67-68.)

See also 67A C.J.S., Parent and Child § 15 and 42 Am. Jur. 2d, Infants §§ 14, 15.

Nursing, convalescent, and rest homes, which furnish shelter, food, and care for the sick, aged, or infirm, are all subject to licensing and regulatory acts. This is widely recognized. See Annot., 97 A.L.R.2d 1187. Surely a children's home is as affected with the public interest as any of those. We hold that the State has a legitimate, vital interest in private establishments which provide residential care for children, and that interest is sufficient to warrant licensing, together with reasonable inspection and regulation.

The next issue is whether K.S.A. 65-501 *et seq.,* requiring the obtaining of a license and the payment of a fee in order to operate

a children's home, as applied to the defendants, violate their rights to the free exercise of religion guaranteed by the First and Fourteenth Amendments of the United States Constitution. The trial court found that the beliefs of the defendants are "truly held," and that "requiring the Defendants to comply with the rules and regulations . . . [applicable] to boarding homes, maternity homes, and placement agencies, would cause them to depart from their religious convictions." The State did not cross-appeal; therefore, findings adverse to the State are nonreviewable. *Vaughn v. Murray,* 214 Kan. 456, 521 P.2d 262 (1974). These nonreviewable findings establish that the defendants' conduct is religiously grounded; as such it is under the protection of the free exercise clause of the First Amendment. *Wisconsin v. Yoder,* 406 U.S. 205, 219-220, 32 L.Ed.2d 15, 92 S.Ct. 1526 (1972).

Appellants rely upon the trial court's finding that the activities and ministries of the defendants, including the operation of the home, are religious in nature and constitute the exercise of religion. They then challenge the licensing and fee requirements as "prior restraints" on the exercise of a constitutionally protected right, the free exercise of their religion as exemplified by their ministry to children in the operation of the home. They cite as controlling *Cantwell v. Connecticut,* 310 U.S. 296, 84 L.Ed. 1213, 60 S.Ct. 900 (1940) and *Kunz v. New York,* 340 U.S. 290, 95 L.Ed. 280, 71 S.Ct. 312 (1951).

*Cantwell* held violative of First Amendment rights a Connecticut statute which made it an offense to solicit funds for religious purposes without a license. The offensive part of the statute, however, was not the mere requirement of a license or permit. What the court found in contravention of the First Amendment was the licensing procedure, which required the secretary of the public welfare council, upon each application for license, to determine whether the cause was a religious one. The court said:

"Without doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent. The State is likewise free to regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience. But to condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution." 310 U.S. at 306-307.

*Kunz* was concerned with a New York City ordinance which made it unlawful to hold public worship meetings on the streets without first obtaining a permit. There was no mention in the ordinance of reasons for which a permit might be refused, and thus the police commissioner, as the licensing official, could exercise unbridled discretion in denying applications. The court said:

"We have here, then, an ordinance which gives an administrative official discretionary power to control in advance the right of citizens to speak on religious matters on the streets of New York. As such, the ordinance is clearly invalid as a prior restraint on the exercise of First Amendment rights. . . .

"[W]e have consistently condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places. . . .

". . . New York cannot vest restraining control over the right to speak on religious subjects in an administrative official where there are no appropriate standards to guide his action." 340 U.S. at 293-295.

In support of their argument that the modest fee fixed by statute for an annual license constitutes a per se violation of the free exercise clause, appellants rely upon *Murdock v. Pennsylvania,* 319 U.S. 105, 87 L.Ed. 1292, 63 S.Ct. 870 (1943). In *Murdock,* the court struck down a licensing ordinance of the City of Jeannette, Pennsylvania, which, as applied, required Jehovah's Witnesses to pay substantial fees and obtain a city license before going from door-to-door distributing literature, spreading their faith, and soliciting people to purchase their religious books and pamphlets. The court said:

"The power to impose a license tax on the exercise of these freedoms is indeed as potent as the power of censorship which this Court has repeatedly struck down. . . . [W]e have something very different from a registration system under which those going from house to house are required to give their names, addresses and other marks of identification to the authorities. . . . [T]he issuance of the permit or license is dependent on the payment of a license tax. And the license tax is fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenues. It is not a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question. It is in no way apportioned. It is a flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment. Accordingly, it restrains in advance those constitutional liberties of press and religion and inevitably tends to suppress their exercise." 319 U.S. 113-114.

These cases are primarily concerned with the dissemination of ideas, the free speech as well as the free exercise aspects of the First Amendment. They stand for the proposition that inordinate

restraints upon the dissemination of religious ideas will not be tolerated. They do not deal primarily with activities secular in nature. Even so, implicit in each opinion is the recognition that some lesser measure of restraint, when necessary for the public good, may be appropriate as to the secular aspects of the activity.

Appellant is equating the operation of homes for children, usually a secular activity, with the dissemination of religious ideas. The teaching of religious doctrine to children simply cannot be equated with every aspect of the physical care of children on an around-the-clock basis for First Amendment purposes. The free exercise clause permits reasonable regulation of otherwise protected religious activity when imposed pursuant to a compelling State interest. *Wisconsin v. Yoder,* 406 U.S. at 215, held that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." Thus when there is a valid State interest, such as its interest in universal education, it is subject to a balancing process when it impinges on free exercise rights.

While religious beliefs cannot be regulated, some overt acts, though in the exercise of one's religious convictions, are not totally free from legislative restriction. In *Sherbert v. Verner,* 374 U.S. 398, 10 L.Ed.2d 965, 83 S.Ct 1790 (1963), the court said:

"The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious *beliefs* as such, *Cantwell v. Connecticut,* 310 U.S. 296, 303. Government may neither compel affirmation of a repugnant belief, *Torcaso v. Watkins,* 367 U.S. 488; nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities, *Fowler v. Rhode Island,* 345 U.S. 67; nor employ the taxing power to inhibit the dissemination of particular religious views, *Murdock v. Pennsylvania,* 319 U.S. 105; *Follett v. McCormick,* 321 U.S. 573; cf. *Grosjean v. American Press Co.,* 297 U.S. 233. On the other hand, the Court has rejected challenges under the Free Exercise Clause to governmental regulation of certain overt acts prompted by religious beliefs or principles, for 'even when the action is in accord with one's religious convictions, [it] is not totally free from legislative restrictions.' *Braunfeld v. Brown,* 366 U.S. 599, 603. The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order." (pp. 402-403.)

Governmental interest in conscription laws was held in *Gillette v. United States,* 401 U.S. 437, 28 L.Ed.2d 168, 91 S.Ct. 828, *rehearing denied* 402 U.S. 934 (1971), to be of a kind and weight sufficient to justify the impact of the conscription laws on those who object to particular wars on religious bases.

We have previously discussed the interest and the duty of the

State as *parens patriae* in the care of minor children. Some regulation of establishments proposing to provide such care is absolutely necessary; even appellants make no objection to the State's fire and safety regulations.

But appellants adamantly and unequivocally refuse to apply for any State license, or to pay the required fee. Absent the existence of licensing procedure, applicable to sectarian and nonsectarian establishments alike, the State lacks essential knowledge required for the exercise of its power and duty to protect children from physical and mental harm. Absent licensing, the fire and safety regulations, with which defendants are willing to comply, could not be effectively enforced and their purpose would be compromised.

The fee is minimal; it does not have the repressive force of the charges imposed by the ordinance attacked in *Murdock*—$5.00 per *year* for a license to operate a residential center for ten or more children, as compared with the *Murdock* fee of $1.50 per day, or over $400 per year when paid on a weekly basis, for the sale of religious literature door-to-door by one person. The five-dollar fee does not purport to meet the actual cost of licensing, let alone inspection and consultation. It is not exclusively a revenue-raising measure, but "a nominal fee imposed as a regulatory measure to defray [at least in small part] the expenses of policing the activities in question." See *Murdock*, 319 U.S. at 113-114.

The compelling interest of the State, as *parens patriae*, is the protection of its children from hunger, cold, cruelty, neglect, degradation, and inhumanity in all its forms. To fulfill this responsibility, the legislature has elected to impose licensing and inspection requirements. To these requirements the defendants' free exercise rights must bow; the balance weighs heavily in favor of those unfortunate children whom the State must protect.

The defendants have no license, and they have not sought one. They state that they do not intend to apply for a license, or to abide by any regulations which they find objectionable on religious grounds. Since we hold that licensing is necessary and the fee reasonable, and defendants have no intention of becoming licensed, the reasonableness of each and every regulation as balanced against defendants' religious objections need not be determined.

One further matter deserves attention. Appellants have wholly

258

failed to avail themselves of the administrative remedies open to them by way of the various waiver provisions encompassed within the pertinent administrative regulations. See, for example, K.A.R. 28-4-266(4). It is a familiar doctrine that administrative remedies should be exhausted before resort is made to the courts. See *State, ex rel., v. Unified School District,* 218 Kan. 47, 542 P.2d 664 (1975); *Jarvis v. Kansas Commission on Civil Rights,* 215 Kan. 902, 528 P.2d 1232 (1974); *Jenkins v. Newman Memorial County Hospital,* 212 Kan. 92, 510 P.2d 132 (1973); *Holmstrom v. Sullivan,* 192 Kan. 746, 391 P.2d 100 (1964). The rule, followed in the great majority of American courts, is stated in 73 C.J.S., Public Administrative Bodies and Procedure § 41:

"Where an administrative remedy is provided by statute, such remedy ordinarily must be exhausted before a litigant may resort to the courts."

The appellants have not applied for a license; they have no license. As we have held above, a license is a prerequisite to the operation of the various child care facilities and services defendants were operating or performing. The trial court's grant of injunctive relief was proper.

The judgment is affirmed.

Fromme, J., not participating.