NOT DESIGNATED FOR PUBLICATION

No. 121,474

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of A.B., M.R., S.R., J.R., M.B., J.B., and K.R.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Opinion filed April 10, 2020.
Affirmed.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ATCHESON, P.J., WARNER, J., and WALKER, S.J.

PER CURIAM: After an evidentiary hearing, the district court terminated Mother's parental rights as to six of her natural children and ordered a permanent custodianship for Mother's oldest child, A.B. Mother contends the evidence did not support the district court's decision to terminate her parental rights or establish a permanent custodianship, but instead showed she was making progress—albeit slowly—toward being able to provide a home for her children. She also claims termination was not in the children's best interests, as they had expressed a desire to reintegrate with her, and termination would not only separate the children from her, but likely from each other.

The decision whether to terminate a person's parental rights is grave and often difficult. But it is not the role of this court to reweigh evidence or second-guess the

1

district court's reasonable exercise of its discretion. These principles direct the outcome in this case. After carefully reviewing the parties' arguments, we affirm.

FACTUAL AND PROCEDURAL HISTORY

On October 31, 2016, Wichita police responded to a welfare check regarding Mother's six children, then ranging in age from 12 to 1 years old, after their great-grandmother reported one of the children—J.R.—had several injuries on his buttocks. The great-grandmother also reported that earlier that evening Mother had spanked J.R. with a belt approximately six times on his back and arms because he had taken Mother's crackers. When they arrived at the scene, the responding officers spoke with A.B., the oldest child, who informed them she had called law enforcement a month earlier because Mother "beats" her. She also told the officers that she and her siblings did not feel safe around Mother. Mother informed the officers that the great-grandmother was angry because she had observed Mother "whooping" J.R. after he stole things. The officers placed all six children in protective custody.

Hospital staff examined J.R. and found several significant injuries consistent with abuse—a cigarette burn on his temple and myriad scars and lesions on his thighs and buttocks. The hospital staff indicated J.R. had too many scars on his body for them to accurately document. Mother subsequently admitted to disciplining her children by slapping their hands or hitting them with a shoe or leather belt, depending on their age.

On November 2, 2016, the Kansas Department for Children and Families (DCF) filed a Child in Need of Care petition on behalf of the children. The district court issued a protective custody order the same day. The next day, the court ordered the children be placed in temporary custody; it adjudicated them as children in need of care on November 22, 2016. In May 2017, Mother gave birth to her seventh child, who was placed in police protective custody shortly after birth. On May 31, 2017, DCF filed a

2

Child in Need of Care petition for the newborn, K.R.; the court ordered temporary custody the next day and adjudged the child to be a child in need of care on November 3, 2017. Most of the children have lived in multiple foster homes since their placement in protective custody, in part because the foster parents could not control the children's behavior.

During the course of this case, Mother's reintegration plan required her to (1) cease using drugs, (2) attend therapy for various mental health issues, (3) secure stable housing, and (4) gain full-time employment and a steady income. Throughout 2017, the court ordered the children remain in DCF custody but found reintegration to still be viable. It made those decisions based on updates from St. Francis Community Services (SFCS)—the organization responsible for placing the children in foster homes and helping mother regain her children—and other care coordinators. But by March 2018, the court found reintegration was no longer viable and requested the district attorney to file a motion to terminate Mother's parental rights. The State filed its motion in April, and the district court set the termination hearing for July 2018.

Mother had a history of drug use. She was evaluated for drug treatment in January 2017 and began in June 2017. The drug-treatment program entailed 16 therapy sessions, 2 per week for eight weeks. Mother attended 60-70% of her scheduled sessions but missed several appointments. She completed her 16 sessions between June and December 2017 before being discharged in February 2018.

Throughout her case, Mother submitted numerous urinalyses (UA) and hair follicles for drug testing. Some of these tests came back negative, but throughout the proceedings the tests also demonstrated Mother's continued drug use:

- In November 2016 (at the outset of the proceedings), Mother submitted a UA that tested positive for marijuana.

- In January 2017, two months into the CINC proceedings and while Mother was pregnant with K.R., Mother submitted a hair follicle test that returned positive results for cocaine.

- In June 2018, a month before the termination hearing, Mother's hair follicle submission again tested positive for cocaine.

Although Mother admitted she used marijuana the day police took her children, she denied consuming cocaine. She explained the first positive cocaine test may have resulted from laced marijuana, she blamed the second on her coming into contact with cocaine on a friend's dresser.

In June 2017, Mother also began attending therapy to address her PTSD and major depression diagnoses. As these diagnoses impact how she handles stress, which influences her parenting, her course of therapy focused on cultivating a positive support system. Stress management is particularly important because several of her children have mental illness diagnoses and receive counseling. During therapy, Mother never admitted she abused her children; she maintained others had done so. But she recognized her role in placing her children in potentially abusive situations. She attended 16 of her 28 therapy sessions; in the months before the July 2018 termination hearing, she stopped attending as frequently. At the termination hearing, she stated she would be willing to resume her treatment.

Mother had a tumultuous housing history. Before February 2017, she lived with a friend. Around March, she used her tax return to rent a house through November. In October, however, her landlord attempted to evict her. She began living with a cousin from October 2017 to July 2018. In late 2017, Mother applied for and reported meeting with someone about public housing, but given the long wait list, she did not obtain

4

placement. She eventually borrowed $300 from a friend for a deposit on a three-bedroom apartment, which she would move into on August 1, 2018.

Finally, Mother's employment was sporadic. In January and February 2017, she worked at Five Guys restaurant. She left after developing preeclampsia during her pregnancy with K.R.; her doctor ordered bed rest from March until the child's birth in May. She worked at Wendy's for a week in February 2018 before leaving after catching the flu. Sometime in May 2018, she worked at a strip club for two weeks. And in late June 2018, she found a job at an inventory company, though her two paychecks prior to the termination hearing showed she had only worked 12 hours collectively. Mother explained part of this was training, and she could work more hours in the future. While unemployed, Mother stated she applied for 10-15 jobs per day, but SFCS case workers could not verify this. She also applied for SSI, though Mother currently is ineligible to receive any State financial assistance besides food stamps.

From November 2016 to February 2018, Mother worked with the same SFCS case workers, who monitored Mother's supervised visits and met with her monthly to gauge her progress. Mother also called them several times each week. In May 2017, SFCS recommended moving towards reintegration—overnight visits with the older children and custody of the newborn—but by February 2018, SFCS recommended adoption based on Mother's lack of employment and housing.

The February 2018 recommendation also coincided with a change in social workers; Mother's case was reassigned to another case worker. When that case worker unexpectedly died shortly after the transfer, a new case worker took over in early April 2018. Although SFCS staff met with mother in March and April, the new case worker did not meet with Mother until June. Neither Mother nor the case worker tried to call each other during that time.

The district court held an evidentiary hearing on the State's termination request on July 31 and August 1, 2018. At the termination hearing, the Director of Reintegration at SFCS stated she would like to see six months of stable employment and housing and continued drug treatment and therapy before recommending reintegration; those goals had not been achieved in the 21 months the case had been pending. The court also heard from Mother's friends, who stated they would support her in raising the children.

At the close of evidence, the court terminated Mother's parental rights for her six youngest children and placed A.B. in a permanent custodianship. It did so based on Mother's lack of stable employment and housing and her intermittent therapy attendance and most recent positive drug test. Mother also had acknowledged the children's abuse but had not taken responsibility for her role, either in causing the children's injuries or in failing to protect them from injuries caused by others. These facts, combined with the case's 21-month duration, led the district court to conclude Mother was an unfit parent and this unfitness would not change for the foreseeable future.

Finally, the court considered the children's interests. The court noted that the four oldest children, who had endured a history of abuse and Mother's lifestyle, each had serious and continuing mental health diagnoses. The court was also concerned about "the possible danger these kids could be in"; it found that the "safety" of the children was at risk, particularly because four of the five known fathers of the children had criminal records for violent and dangerous offenses. Therefore, giving "primary consideration" to "the physical, mental, and emotional health of the children," the court found it was in their best interests to terminate Mother's parental rights concerning her six youngest children and to establish an alternative permanent custodianship for A.B.

Mother appeals.

6

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). At the same time, children have the right "to receive proper care, control[,] and guidance"; when a child's rights are threatened in the course of the parent-child relationship, the State "has the duty to intervene in the [child's] behalf." *Lennon v. State*, 193 Kan. 685, Syl. ¶ 2, 396 P.2d 290 (1964). Proceedings involving the termination of parental rights lie at the intersection of these often-competing interests.

Before terminating a parent's rights or appointing a permanent custodianship, a district court must find the State has proven the parent is unfit; the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future; and termination of parental rights (or permanent custody) is in the best interests of the child. K.S.A. 2019 Supp. 38-2269(a), (g). Due to the fundamental nature of parental rights, any findings regarding a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 2019 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014). When reviewing a finding of parental unfitness, this court must determine, after considering all the evidence in a light favoring the State, whether a rational fact-finder could have found that finding to be highly probable. *In re B.D.-Y.*, 286 Kan. at 705. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

After finding a parent unfit, the district court must determine if termination of parental rights (or establishment of a permanent custodianship) is "in the best interests of the child"—or here, children. K.S.A. 2019 Supp. 38-2269(g)(1); see also K.S.A. 2019 Supp. 38-2269(g)(3) ("If the court does not terminate parental rights, the court may authorize appointment of a permanent custodian."). This assessment gives "primary

7

consideration to the physical, mental and emotional health of the child." K.S.A. 2019 Supp. 38-2269(g)(1). Because determining the child's best interests is inherently a judgment call, we will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds the broad latitude it is afforded if it rules in a way no reasonable person would have under the circumstances, ignores controlling facts or relies on unproven factual representations, or acts outside the appropriate legal framework. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

Mother raises two overarching arguments in her appeal. *First*, Mother argues the State did not prove by clear and convincing evidence that she was an unfit parent. Mother contends she made reasonable progress toward reintegration, and the court's conclusions to the contrary were not supported by the record. Mother attributes any gaps in communication or shortfalls to the reassignment of case workers from SFCS, not her own conduct. *Second*, Mother claims the district court erred in its best-interests analysis, particularly because its termination decision likely will not only separate the children from Mother but also from one another. We address each of these claims in turn.

1. *The State proved Mother's unfitness by clear and convincing evidence.*

K.S.A. 2019 Supp. 38-2269 lists several nonexclusive factors a court considers—singularly or in combination—in determining whether a parent is unfit. The district court here cited the following provisions when it terminated Mother's parental rights:

- K.S.A. 2019 Supp. 38-2269(b)(7) (failure to rehabilitate the family);

- K.S.A. 2019 Supp. 38-2269(b)(8) (lack of effort to adjust Mother's circumstances to meet the children's needs);

8

- K.S.A. 2019 Supp. 38-2269(c)(3) (failure to carry out a reasonable court-approved plan directed toward reintegration with Mother).

Any of these factors alone may be sufficient to support unfitness. K.S.A. 2019 Supp. 38-2269(f).

Mother claims that the record does not indicate by clear and convincing evidence that she was unfit. In particular, Mother argues that the decision by SFCS case workers in February 2018 was based not on her conduct, but on changes in SFCS staff who worked on her case. She also contends the district court's ruling failed to consider the progress she had made—that she completed drug treatment, had signed a lease for an apartment, and now had a job.

Mother presented these same arguments to the district court, and that court was not persuaded. On appeal, it is not the role of this court to reweigh the evidence, but to determine whether there is sufficient evidence in the record by which a court could conclude it was highly probable that Mother was unfit to parent these children. *In re B.D.-Y.*, 286 Kan. at 705. The evidence presented below meets this standard.

The record indicates that SFCS made reasonable efforts to reintegrate the family. Mother had the same case workers for 16 months, from November 2016 to February 2018. During that time, SFCS referred Mother to substance-abuse treatment and therapy while also encouraging her to find housing and employment. Communication may have become less frequent after the February 2018 case reassignment, but Mother still interacted with SFCS staff in March and April 2018 during monthly meetings. And Mother also was responsible for contacting SFCS if she needed assistance.

Likewise, there is ample evidence in the record indicating Mother's lack of effort in changing her circumstances and failure to carry out the court-approved reintegration plan:

- During the 21 months this case was pending before the district court, Mother maintained independent housing for approximately eight months.

- During the 18 months she could work while she was not on bed rest during her pregnancy, Mother was sporadically employed and worked few hours.

- Mother initially attended some of her therapy sessions but stopped. Since her diagnoses impact how she manages stress, this treatment is particularly important given her numerous children and their own mental health diagnoses.

- Mother did progress and finish her drug-treatment program, but one month before the termination hearing (four months after finishing the program), she tested positive for cocaine.

Similarly, there was evidence at the termination hearing to support the district court's conclusion that Mother will remain unfit for the foreseeable future. Although Mother stated she had been working since the end of June 2018, she had only worked about 12 hours total during that time, and the district court noted she had turned down opportunities to work additional time and gain additional income. While Mother had signed a new lease beginning August 1, 2018, the court indicated there was no record of Mother maintaining stable housing. And Mother had demonstrated recent drug use. The record supports the district court's conclusion that Mother's circumstances were not likely to change.

2. *The district court did not abuse its discretion in analyzing the best interests of the children.*

Mother also argues the district court erred when it determined that it was in the best interests of the children to terminate Mother's parental rights (or, in the case of A.B., to establish a permanent custodianship). Mother argues such action would not be in the children's interests because they are attached to her, and termination would entail separating the children from each other as well as from her.

A district court's analysis of the best interests of the child is governed by K.S.A. 2019 Supp. 38-2269(g)(1). Under that statute, after a court has made a finding that a parent is unfit, "the court shall consider whether termination of parental rights . . . is in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). The statute further instructs the court to "give primary consideration to the physical, mental and emotional health of the child"—directing that "[i]f the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2019 Supp. 38-2269(g)(1).

Our review of the record demonstrates the district court considered the factual allegations and arguments presented and ultimately concluded it was in the six younger children's best interests to terminate Mother's parental rights and, in the case of A.B., to establish a permanent custodianship. In particular, the court noted that the four oldest children—who had lived with Mother the longest and thus had witnessed the lack of stability and history of abuse—all had been diagnosed with serious mental health conditions. The court also noted a serious concern for the children's safety, especially given their past physical abuse and Mother's repeated decisions to engage in romantic relationships with men who had violent criminal histories.

SFCS staff indicated six to nine months would be needed to determine whether Mother should be reintegrated with her children. But at the time of the hearing, only one

11

of the children—A.B.—was older than 10; three of the children were under the age of 6. The case had already progressed for 21 months. The district court noted that an additional six to nine months would not be workable from the perspective of these younger children, who barely knew Mother.

The district court did not abuse its discretion in analyzing the children's best interests. Thus, the court did not err in terminating Mother's parental rights with regard to the six youngest children. With regard to A.B., who was 14 at the time of the hearing, the court found a permanent custodianship—rather than termination—to be the best course of action since A.B. had known Mother the longest and wished to continue to have some kind of relationship with her; the permanent custodianship accomplished that goal while still protecting A.B.'s health and safety. This conclusion, like the court's termination decision, was reasonable and supported by the evidence in the record.

Affirmed.